RESALE MOBILE HOMES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 39593-84.         Filed December 21, 1988.

*Robert Shaiman* and *John D. Moats,* for the petitioner.
*Barbara E. Horan,* for the respondent.

JACOBS, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes in the following amounts:

| *TYE May 31—* | *Deficiency* |
|---|---|
| 1978 | $9,289 |
| 1979 | 194,698 |
| 1980 | 156,858 |
| 1981 | 99,056 |

By its amended petition, petitioner claims entitlement to a refund of $3,015 as a result of a carryback (from its 1982 taxable year to its 1979 taxable year) of an investment tax credit. By his amended answer, respondent claims an increased deficiency in the amount of $9,302 with respect to petitioner's 1980 taxable year based on an allegedly erroneous refund to petitioner.

After concessions, the issues for decision are: (1) Whether petitioner correctly reported its entitlement to a portion of interest income to be collected under consumer installment contracts it sold to finance companies; (2) whether petitioner is entitled to an investment tax credit carryback from its 1982 taxable year to its 1979 taxable year; and (3) whether petitioner incurred an operating loss for its 1981 taxable year entitling it to net operating loss carrybacks to its 1978 and 1979 taxable years.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference.

Petitioner, a Colorado corporation having its principal place of business located in Denver, was engaged in the business of selling new and used mobile homes at retail under the name Mobile World. Petitioner reports its income using the accrual method of accounting.

When purchasing a mobile home on credit, the purchaser was required to sign a document, referred to as consumer paper, evidencing the purchaser's obligation to pay the balance due in installments, plus interest. The consumer paper was then immediately sold by petitioner to either of

two finance companies, Midland Federal Savings & Loan Association of Denver (Midland) or Advance Mortgage Co. (Advance), which had agreed in advance to purchase the consumer paper and which thereafter collected the installment payments made by the purchaser of the home.

Upon the sale of the consumer paper to one of the finance companies, petitioner was entitled to receive not only the principal amount of the consumer paper, but also the excess (the participation interest) of the total amount of interest to be collected from the mobile home purchaser pursuant to the consumer paper over the total amount of interest the finance company charged petitioner (the buy rate). The interest rate petitioner charged the purchaser in the consumer paper was dictated by competition in the mobile home market; such rate was usually higher than the buy rate, resulting in participation interest being payable to petitioner.

Pursuant to its agreements with the finance companies, petitioner warranted, among other things, that the consumer paper sold complied with all Federal, State, and local laws; that it was free from all defenses, setoffs, and counterclaims; that petitioner had a valid first lien against the mobile home sold; and that upon the finance company's purchase of the consumer paper, the finance company would have a valid first lien against the mobile home. In the event any of these warranties proved untrue, petitioner was obligated to repurchase the consumer paper with respect to which there was a breach of warranty.

Prior to the taxable years in dispute, Midland immediately paid petitioner the principal amount of the consumer paper purchased. The participation interest was retained by Midland in a reserve account. This reserve account served as security in the event one of petitioner's warranties to Midland was breached, which in fact never occurred.

Prior to the taxable years in dispute, the consumer paper (the old consumer paper) required the mobile home purchaser to pay a stated number of equal installment payments. Late payment did not vary the portion of each installment payment otherwise allocable to interest and principal. However, in the event the purchaser's installment

payment was late, a delinquency charge was imposed; such charge was retained by Midland.

The precalculated participation interest was reduced only if the home purchaser prepaid the old consumer paper or if repossession in the event of default occurred (such events collectively referred to as a prepayment). In the event of prepayment, the unearned finance charge under the old consumer paper was calculated using the Rule of 78's.[1] Other than in the event of prepayment, the exact amount of interest to be earned under the old consumer paper could be calculated at the time the paper was created and sold by petitioner to the finance company. Also, the exact participation interest, including the amount held back in the dealer reserve account, could be calculated at the time the consumer paper was sold to the finance company.

The transactions between petitioner and Advance prior to the years in dispute were similar to those between petitioner and Midland. However, when Advance purchased the consumer paper, it paid petitioner the principal amount of the consumer paper plus 50 percent of the participation interest. The balance of the participation interest was held in a reserve account which was paid to petitioner to the extent not required as security for petitioner's obligations.

Under its agreements with both Advance and Midland, petitioner's right to the participation interest was earned, and its right to receive the participation interest was fixed, at the time the consumer paper was sold.

Petitioner reported the entire participation interest received from Midland and Advance as income in the year in which the consumer paper was sold. In the event the mobile home purchaser prepaid the consumer paper, petitioner claimed (in the year of prepayment) a deduction for the participation interest previously reported but not received due to the prepayment.

Under the terms of the agreements between petitioner and the finance companies in effect prior to the taxable years in dispute (the old financing agreements), each of the

[1]The Rule of 78's is a method of allocating interest among time periods during the term of the loan. Under this method, the amount of interest allocable to each time period is determined by multiplying the total interest payable over the loan term by a fraction (a) the numerator of which is the number of periods remaining on the loan at the time the calculation is made, and (b) the denominator of which is the sum of all time periods during the loan term.

finance companies aggregated the balance due under all consumer paper purchased from petitioner as well as the total participation interest held back in the reserve account. Petitioner was entitled to monthly payment of that portion of the amount held in reserve which exceeded a percentage (3 percent with respect to Midland; 5 percent with respect to Advance) of the balance due under all consumer paper purchased from petitioner. Thus, since the amount payable to petitioner depended solely on the balance in the reserve account, petitioner received payment of the participation interest from the finance company prior to payment by the mobile home purchaser to the finance company.

On October 28, 1975, the Colorado statute regarding the calculation of the balance due on consumer paper in the event of prepayment (Col. Rev. Stat. tit. 5, pt. 2, sec. 210, (1973)) was amended to prohibit the use of the Rule of 78's in calculating such balance. The amended statute provided that after May 14, 1976, in the event the consumer paper was prepaid, the balance due was to be calculated using simple interest.

As a result of the statutory amendment, the agreements between the finance companies and petitioner were changed to reflect the fact that if the consumer paper were prepaid, the amount of interest deemed earned would be substantially reduced. In addition, the terms of the consumer paper had to be changed (the new consumer paper).

The new consumer paper contained provisions requiring each payment made by the mobile home purchaser to be applied first to accrued interest through the date of payment and then to principal. Accrued interest was computed on a simple interest basis which was dependent upon the number of days between actual payments, rather than the due dates of such payments.

Since the amount of interest to be earned with respect to each payment was based upon the date payments were actually received rather than the dates they were due, after the change in the law, neither the total amount of interest to be earned under the new consumer paper nor the participation interest could exactly be determined in advance. However, both the amount of interest to be earned on each individual contract of new consumer paper and the

participation interest could be reasonably estimated by using an amortization schedule which assumed that all required payments would be made every 30 days.

Under petitioner's agreement with Midland during the taxable years in dispute (the new Midland agreement), petitioner no longer received the participation interest in advance of payment by the mobile home purchaser; rather, it received the participation interest from the new consumer paper when Midland received the installment payments from the mobile home purchaser. When a payment under the new consumer paper was received, Midland would (a) calculate the amount of such payment to be applied to accrued interest, (b) determine the amount of such interest to be retained by Midland (based upon the buy rate), and (c) determine the amount of the participation interest to be paid to petitioner. Midland would then pay petitioner the amount of participation interest so determined. A dealer reserve account was not established (although Midland had the option to do so), and there was no percentage ratio required to determine the extent by which petitioner was to receive payment with respect to the participation interest.

The agreement between Advance and petitioner during the taxable years in dispute (the new Advance agreement) provided that Advance would maintain a reserve account for petitioner. The participation interest was credited to this account and paid to petitioner over the life of the consumer paper.

Petitioner prepared a list of consumer paper sold to the finance companies setting forth the amount of participation interest it expected to receive if all the mobile home purchasers timely made all payments to maturity.

With respect to the new consumer paper, petitioner reported the participation interest as income as checks were received from the finance companies. Respondent determined that petitioner should have accrued all the participation interest in the year the new consumer paper was sold (on the theory that petitioner's right to receive such income was fixed and the amount was reasonably ascertainable). As a result of such determination, and his review of petitioner's

financial statements[2] and its accountant's (Coopers & Lybrand's) workpapers, respondent claims petitioner understated its income as follows:

| Petitioner's taxable year ended May 31— | Petitioner's gross receipts as determined by respondent | Petitioner's gross receipts as reported by petitioner | Increase in petitioner's taxable income as determined by respondent |
|---|---|---|---|
| 1979 | $4,262,512 | $3,854,512 | [3]$410,000 |
| 1980 | 4,599,073 | 4,249,073 | 350,000 |
| 1981 | 4,016,179 | 3,701,179 | 315,000 |

On its tax return for the taxable year ended May 31, 1981, petitioner claimed a $56,809 net operating loss, which it carried back to taxable years ended May 31, 1978, and May 31, 1979. Respondent disallowed the loss, and in turn the carrybacks, because of his determination that petitioner understated its income for its taxable year ended May 31, 1981.

On its tax return for the taxable year ended May 31, 1982, petitioner claimed entitlement to a $3,760 investment tax credit of which it used $745. Petitioner filed an amended return for its taxable year ended May 31, 1979, claiming a carryback of the unused amount of the investment tax credit, i.e., $3,015. Respondent's notice of deficiency disallowed the carryback.

In December 1983, petitioner filed an amended return for its taxable year ended December 31, 1980, requesting a refund in the amount of $9,302; respondent issued a refund in the amount requested. Subsequently, respondent determined that the notice of deficiency did not take into account this refund. By an amendment to answer, respondent claims an increased deficiency for the $9,302 refunded.

At trial, respondent introduced, through a tax partner of Coopers & Lybrand, a copy of Coopers & Lybrand's audit workpaper entitled "Mobile World, finance income computation carryforward." The workpaper, dated September 10, 1980, was prepared by two individuals formerly employed by Coopers & Lybrand, in connection with the preparation

---

[2]In its financial statements, petitioner reported the finance income as an asset in an account entitled "Finance income included in uncollected finance contracts held by financing institutions"; there was also a contra liability account entitled "Unearned finance income."

[3]The apparent $2,000 discrepancy was not explained.

of petitioner's financial statements for its year ended May 31, 1980. No one explained the computations set forth on the workpaper, and the auditor's note set forth thereon is not comprehensible due to the poor quality of the copy filed with the Court. Petitioner objects to the admission of the workpaper on the grounds of hearsay and relevancy. Respondent contends that the workpaper falls within the business records exception to the hearsay rule and is relevant. We did not use the workpaper in reaching our decision, hence we need not rule on petitioner's objection.

## OPINION

The first issue for determination is whether petitioner properly reported the participation interest during the taxable years in dispute. Section 446(a)[4] provides the general rule that:

Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

Section 446(b) provides that if the method used by the taxpayer does not clearly reflect its income, the computation of such taxable income is to be made under a method which, in the opinion of the Secretary, clearly reflects income.

Section 451(a) provides the following:

The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Under the accrual method of accounting, income is includable in gross income when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Secs. 1.451-1(a), 1.446-1(c)(1)(ii), Income Tax Regs.; *Spring City Foundry Co. v. Commissioner,* 292 U.S. 182, 184-185 (1934).

Section 446(e) provides "a taxpayer who changes his method of accounting on the basis of which he regularly

---

[4]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in dispute.

computes the income in keeping his books shall, before computing his income under the new method, secure the consent of the Secretary." A change in the method of accounting includes a change in treatment of any material item used in the overall plan. Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. Further, the regulations provide that a change from the accrual method to the cash receipts and disbursement method is a change in accounting method. Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.

Petitioner is and always has been an accrual basis taxpayer. Respondent contends that by reporting the participation interest as received from the finance company, rather than when the new consumer paper was sold, petitioner changed its method of reporting the participation interest from the accrual method to the cash receipts and disbursements method and that such change was both unauthorized and improper. Petitioner argues otherwise, claiming that until receipt, the participation interest was not fixed and determinable. We agree with respondent.

Under the accrual method of accounting, the inclusion of an amount in income is based on the *right to receive* the amount, *not the actual receipt* of the amount. When the right to receive the amount is fixed, and the amount can be determined with reasonable accuracy, the amount must be accrued into income. *Spring City Foundry Co. v. Commissioner, supra.* Here, petitioner's sale of the new consumer paper activated its right to receive the participation interest, even though payment of such interest was to be deferred.

We believe the rationale of *Commissioner v. Hansen,* 360 U.S. 446 (1959), is apposite to the instant case. In *Hansen,* three accrual basis taxpayers (two retail automobile dealers and one trailer dealer) sold installment paper to finance companies, receiving a major percentage of the paper's face value from them. The finance companies retained an amount equal to the remaining percentage of the paper's face value in a dealer reserve account as security for payment of the dealer's contingent liabilities. The finance companies made payments to the dealers from the reserve account as the accumulated reserves exceeded a percentage of the unpaid balances on the installment paper.

The dealers argued that the existence of the reserves foreclosed their having a present and enforceable right to the payment of the income. The Supreme Court disagreed, stating that the right to presently recover the reserves was not the key to the accrual of income, but rather, it is the time of acquisition of the fixed right to receive the reserves, which the Court held occurred at the time of sale of the installment paper.

The dealers also argued that the reserves were subject to such contingencies that they could not have reasonably determined in the year of sale the amount of reserves they would ultimately receive. The Court disagreed with this argument, stating that since the amounts in the reserve accounts would either be paid to the dealers or applied to their obligations under their guarantees, the dealers in essence would "receive" the entire amounts in the reserve accounts in all events. In this regard, it is to be noted that in the instant case, the participation interest held in reserve would either be paid to petitioner in cash or applied to satisfy petitioner's obligations to the finance companies.

In the instant case, petitioner acquired a fixed right to receive the participation interest when it sold the consumer paper to the finance companies. While petitioner could not compel the finance companies to immediately pay over the participation interest, such is not the key to the accrual of income.

Petitioner argues that the instant case differs from *Hansen* because, under the arrangements between petitioner and the finance companies, there were no reserve accounts. We do not believe the creation of a reserve account is controlling. A reserve account is simply a bookkeeping entry. The finance companies intended to share the interest paid by the mobile home purchasers with petitioner; however, they obviously were unwilling to share interest which they did not receive due to the purchaser's default or prepayment. Economically, holding back payment to petitioner until such time as participation interest was received by the finance company served the same purpose as the creation of a reserve account.

Petitioner next contends that the amount of income they were to receive could not be determined with reasonable

accuracy. While the word "accuracy" means exactness or precision, when modified by the word "reasonable" it implies something less than an exact or completely accurate amount. *George K. Herman Chevrolet, Inc. v. Commissioner,* 39 T.C. 846, 850 (1963).

An accrual basis taxpayer must report income in the year the right to such income accrues, despite the necessity for mathematical computations or ministerial acts. *George K. Herman Chevrolet, Inc. v. Commissioner, supra at* 850. In addition, where an amount of income is properly accrued on the basis of a reasonable estimate and the exact amount is later determined, any difference may be included in income or deducted, as appropriate, in the year in which the correct amount is determined. Sec. 1.451-1(a), Income Tax Regs.; *Continental Tie & Lumber Co. v. United States,* 286 U.S. 290 (1932).

In our opinion, the amount of deferred finance income payable to petitioner was capable of *reasonable* estimation at the time of sale of the new consumer paper. The amount of such income could be calculated through amortization tables, and we find persuasive that such calculation was in fact reflected in petitioner's financial statements. We recognize that there may be some variation in the final amounts received by petitioner due to the default of purchasers or other prepayment of the paper. However, this factor alone does not prevent petitioner from accruing the amount estimated. *Commissioner v. Hansen, supra.* We do not believe that any variance in amount, due to periodic or late payments, would be of such significance as to prevent petitioner from making a reasonable estimate of the amount to be received or that any errors in such estimation would stand incapable of correction in a later year. As such, we find that respondent properly computed petitioner's participation interest for the taxable years in dispute.

The next issue to be addressed is whether petitioner is entitled to an investment tax credit carryback in the amount of $3,015 from its 1982 taxable year to its 1979 taxable year. Petitioner bears the burden of proving entitlement to the investment tax credit. *Munford, Inc. v. Commissioner,* 87 T.C. 463, 488 (1986), affd. 849 F.2d 1398 (11th Cir. 1988).

Other than a copy of its amended return for the fiscal year ended 1979, petitioner failed to produce any evidence from which it can be determined whether petitioner is entitled to the claimed investment tax credit carryback. Because of such failure, we are unable to ascertain whether an investment tax credit arose in 1982, and if so, whether it was actually of sufficient magnitude to permit a carryback. Accordingly, petitioner is not entitled to the claimed carryback.

The final issue is whether petitioner is entitled to net operating loss carrybacks from its 1981 taxable year to its 1978 and 1979 taxable years. Since the resolution of this issue is dependent upon the resolution of the first issue, i.e., the accrual 'of the participation interest issue, and since we sustained respondent's determination with respect to that issue, it follows that petitioner had no net operating loss for its 1981 taxable year available for carryback to its 1978 and 1979 taxable years.

Because we have resolved the issues in favor of respondent, the $9,302 refund with respect to petitioner's 1980 taxable year was erroneous. Accordingly, respondent is entitled to the asserted $9,302 increase in deficiency for such year.

To reflect concessions made by respondent,

*Decision will be entered under Rule 155.*