**RESALE MOBILE HOMES, INC.,**
**Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 90–9015.**

United States Court of Appeals, Tenth Circuit.

May 22, 1992.

---

Robert Shaiman, Lohf, Shaiman & Ross (John D. Moats and Mark H. Scheffel, John D. Moats & Associates, with him, on the briefs), Denver, Colo., for petitioner-appellant.

Steven W. Parks, Atty., Tax Div. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and David English Carmack, Attys., Tax Div., with him, on the brief), Dept. of Justice, Washington, D.C., for respondent-appellee.

Before LOGAN and SEYMOUR, Circuit Judges, and WINDER, District Judge.*

LOGAN, Circuit Judge.

Petitioner Resale Mobile Homes, Inc., appeals a decision of the Tax Court affirming the Commissioner of Internal Revenue's determination of deficiencies in petitioner's federal income tax returns for the years 1978–1981. The Tax Court, in its opinion reported as *Resale Mobile Homes, Inc.*, 91 T.C. 1085 (1988), found that petitioner must

---

* The Honorable David K. Winder, United States District Judge for the District of Utah, sitting by designation.

report anticipated participation interest from consumer installment sales contracts it sold to finance companies in the tax year those contracts were sold. Petitioner argues that the Tax Court incorrectly applied the applicable "all events" test; it also contends the Tax Court improperly increased the deficiency for a 1980 tax refund of $9,302. This court has jurisdiction under 26 U.S.C. (I.R.C.) § 7482(a)(1).

I

The Tax Court carefully and accurately outlined the facts of this case, *see* 91 T.C. at 1086–92, and we repeat here only a brief synopsis. We accept the Tax Court's findings of fact, which were largely stipulated or uncontested.

In all relevant years petitioner was in the business of selling mobile homes. Typically, when a purchaser bought one of petitioner's mobile homes on credit, petitioner immediately sold the retail sales contract (consumer paper) to one of two finance companies, Midland Federal Savings & Loan Association of Denver (Midland) or Advance Mortgage Co. (Advance) (collectively "finance companies"). As consideration petitioner received from the finance companies the principal or face amount stated in the consumer paper plus the right to receive a portion of the interest rate charged to the purchaser (participation interest). 91 T.C. at 1086–87. Petitioner is an accrual basis taxpayer, and before the tax years at issue it reported the partic-

ipation interest as accrued income on its tax return for the year in which the consumer paper was sold to finance companies.

Also under petitioner's arrangements with the finance companies before 1975, the participation interest was credited to reserve accounts on the finance companies' books at the time these companies acquired the consumer paper from petitioner.[1] Amounts in these reserve accounts were held back by the finance companies as collateral for certain warranties, and when the reserve accounts reached specified levels payments were made to petitioner. If customers defaulted or prepaid on the consumer paper, and therefore did not pay the full amount of the interest specified in the paper, the finance companies calculated petitioner's unearned participation interest and deducted that amount from the reserve accounts. *Id.* at 1088. Petitioner would then claim a tax deduction for the participation interest, which it had previously reported, in the year of the default or prepayment. *Id.*

In 1975, responding to a change in Colorado law making interest amounts in the event of early or late payments more difficult to forecast precisely in any given contract,[2] petitioner and the finance companies changed their agreements. Under the new Midland agreement Midland did not keep a reserve account, although it had the option of doing so.[3] Instead of a reserve account,

---

1. Midland retained the whole amount of participation interest in the reserve account; Advance retained 50% of the participation interest in the reserve account and paid the other 50% to petitioner. 91 T.C. at 1088.

2. Colo.Rev.Stat. § 5–2–210 was amended in 1975 to prohibit the use of the "Rule of 78's" as a method for calculating the balance due on consumer paper in event of prepayment. Instead, the amended statute required use of simple interest in such calculations. 91 T.C. at 1089; *see* Colo.Rev.Stat. § 5–2–210; *see also* I R. doc. 6–A, ¶ 35.

3. The relevant provisions of the 1975 contract with Midland provides:

    4. Midland's compensation to Dealer shall be as follows: the difference between Midland's buy rate and the Annual Percentage Rate

charged the purchaser shall be called the "Dealer Participation Rate."

    . . . .

b. On all consumer paper discounted by Midland on or after October 28, 1975, Midland shall pay Dealer monthly as follows; upon Midland's receipt of monthly payments from purchasers. Midland shall pay to Dealer an amount equivalent to a percentage of the simple interest earned on that consumer paper purchased from Dealer on which payments have been received. Such amount shall be computed according to the formula set forth in the form attached and labeled Exhibit B. This amount shall be the difference between Midland's buy rate and the rate charged purchaser. Midland's buy rate shall be indicated in the approval summary for each individual transaction. Dealer shall from time to time be furnished guidelines for

the interest due petitioner was calculated after the obligor on the consumer paper made the monthly payment and it was then sent to petitioner. *Id.* at 1090. Although the new Advance agreement contemplated that Advance would continue to maintain a reserve account, petitioner asserts Advance never maintained one. We need not resolve this factual dispute; it was not determinative of the Tax Court's opinion, *see* 91 T.C. at 1094, nor is it determinative of this appeal.[4] Allegedly because of these new agreements, petitioner ceased reporting the total participation interest as accrued income on its tax returns for the years 1978–1981, but instead reported the income only when checks were received from the finance companies. *Id.* The Commissioner issued notices of deficiency based upon its determination that petitioner had to report as accrued income a reasonable estimate of all the participation interest in the year the consumer paper was sold to the finance companies. The Tax Court upheld the Commissioner's determination and its handling of the 1980 tax refund claim. Petitioner appealed to this court.

## II

### A

The Tax Court's conclusions of law are reviewed de novo by this court, while the Tax Court's findings of fact are reviewed under a clearly erroneous standard. *Love Box Co., Inc. v. Commissioner*, 842 F.2d 1213, 1215 (10th Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); *see also* I.R.C. § 7482(a)(1) (court of appeals to review tax court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury"); *National Collegiate Athletic Ass'n v. Commissioner*, 914 F.2d 1417, 1420 (10th Cir.1990) (discussing standard of review for tax court decisions). The issue "[w]hether a taxpayer has satisfied the 'all events' test is a question of law" subject to de novo review. *Challenge Publications, Inc. v. Commissioner*, 845 F.2d 1541, 1543 (9th Cir.1988).

In this area of the tax law, however, the Commissioner is granted by statute "broad powers in determining whether accounting

---

Midland's buy rates; the rate on any individual transaction shall be determined by Midland.

c. *At its option,* Midland may require Dealer to maintain a Dealer Reserve Account ... on all paper discounted on or after October 28, 1975. Should Midland exercise this option, paragraph 4(b) as set forth herein shall be inapplicable to Dealer so long as such Dealer Reserve Account shall be maintained.

III R. ex. 17–Q, ¶ 4 (emphasis added).

**4.** One of petitioner's employees testified that there was no holdback by Advance. II R. 77–78. Petitioner apparently equates "holdback" in context to mean reserve account. The clear language of the agreement, on the other hand, clearly anticipates a reserve account. The agreement states:

Dealer is engaged in the business of selling mobile homes at retail and, in the ordinary course of Dealer's business, originates Retail Installment Sales Contracts ("Contracts") executed by customers of Dealer ("Buyers") to finance the purchase at retail of mobile homes from Dealer. Dealer wishes to sell such Contracts to Advance, and Advance is willing to purchase such Contracts, on the following terms and conditions:

....

4. Advance shall retain on deposit and under Advance's sole control, a Dealer Reserve account to which shall be credited an amount to

be determined by computing the "Reserve Rate" which is the difference between the interest rate charged by the Dealer on the contract and the existing corporate retention rate charged by Advance. The "Reserve Rate" (not to exceed 2%) shall then be multiplied by the term of the contract (not to exceed 10 years). The resulting percentage shall be applied to the unpaid cash price plus insurance charges and other fees. The resulting "Base Reserve Amount" shall be the total amount of money credited to the Dealer Reserve account for that particular contract and shall be paid to the Dealer only "as earned" during the entire term of the contract. The amounts retained in the reserve account need not be segregated or kept in a separate fund, and no interest shall be payable thereon. Dealer shall have no right to sell, assign, transfer, or convey Dealer's interest in the reserve account or any part thereof. The Dealer Reserve is established as security for: (a) the performance of all of Dealer's obligations hereunder; (b) the performance of all of Dealer's obligations under all Contracts purchased by Advance; (c) the payment of any other indebtedness owed by Dealer to Advance; and (d) the payment of prepayment rebates to Buyers.

III R. ex. 18–R.

methods used by a taxpayer clearly reflect income," and the Commissioner "may require that 'computation shall be made in accordance with such method as in [his] opinion ... does clearly reflect the income.'" *Commissioner v. Hansen*, 360 U.S. 446, 467, 79 S.Ct. 1270, 1282, 3 L.Ed.2d 1360 (1959) (quoting 26 U.S.C. § 41 (1952)) (brackets in original); *see also United States v. Hughes Properties, Inc.*, 476 U.S. 593, 603, 106 S.Ct. 2092, 2098, 90 L.Ed.2d 569 (1986) (Commissioner has broad discretion, citing 26 U.S.C. § 446(b) and *Hansen*). The Internal Revenue Code states "[i]f no method of accounting has been regularly used by the taxpayer, *or if the method used does not clearly reflect income*, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." I.R.C. § 446(b) (emphasis added).[5] Moreover, "[t]he term 'method of accounting' includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item." Treas.Reg. § 1.446–1(a)(1); *accord Hughes*, 476 U.S. at 603, 106 S.Ct. at 2098 (citing § 1.446–1(a)(1)); *Jerry Lipps, Inc.*, 59 T.C.M. (CCH) 849, 865–66 (1990) (same).

■ Petitioner at all relevant times was an accrual basis taxpayer. *See* I.R.C. § 446(c)(2). The key to the accrual method of accounting is the well recognized "all events" test. "Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Treas.Reg. § 1.446–1(c)(ii); *accord* Treas. Reg. § 1.451–1(a). Under this two-part analysis, income is accrued and must be reported when (1) the taxpayer has a fixed right to receive the income, and (2) the income can be determined with reasonable accuracy. *See Kent Homes, Inc. v. United States*, 512 F.2d 395, 397 (10th Cir.1975). We now apply this two-part analysis to the instant appeal.

**B**

■ The law is firmly established that under the accrual method the right to receive income, not actual receipt of income, is controlling. *E.g., Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184–85, 54 S.Ct. 644, 645, 78 L.Ed. 1200 (1934). Moreover, the fact that a taxpayer cannot presently compel payment of the money is not controlling. *Hansen*, 360 U.S. at 464, 79 S.Ct. at 1280.

■ The Tax Court found that petitioner "acquired a fixed right to receive the participation interest when it sold the consumer paper to finance companies. While petitioner could not compel finance companies to immediately pay over the participation interest, such is not the key to the accrual of income." 91 T.C. at 1094. The Tax Court believed *Hansen* to be controlling. In *Hansen*, money held back in reserve accounts to guarantee payment of dealers' contingent liabilities was deemed accrued income. *Id.* at 467–68, 79 S.Ct. at 1282. Courts have read *Hansen* to require that participation interest, held back in reserve accounts to guarantee payment of contingent liabilities, be reported as accrued income. *E.g., Shapiro v. Commissioner*, 295 F.2d 306 (9th Cir.1961), *cert. denied*, 369 U.S. 829, 82 S.Ct. 844, 7 L.Ed.2d 794 (1962); *General Gas Corp. v. Commissioner*, 293 F.2d 35 (5th Cir.1961), *cert. denied*, 369 U.S. 816, 82 S.Ct. 826, 7 L.Ed.2d 783 (1962); *Morgan v. Commissioner*, 277 F.2d 152 (9th Cir.1960); *Klimate Master, Inc.*, 42 T.C.M. (CCH) 85 (1981); *see also Wiley v. Commissioner*, 266 F.2d 48 (6th Cir.), *cert. denied*, 361 U.S. 831, 80 S.Ct. 80, 4 L.Ed.2d 73 (1959) (decided pre-*Hansen*).

Although petitioner previously reported participation interest as accrued income in the year the consumer paper was sold to finance companies, it now argues that under the new agreements with the finance companies *Hansen* and its progeny are not controlling. Petitioner asserts that no money is paid into reserve accounts, and that petitioner has no fixed right to receive the participation interest until the mobile

---

**5.** Section 446(b) is the successor to the § 41 quoted in *Hansen*.

home purchasers make their required monthly payments on the consumer paper. According to petitioner, a purchaser's monthly payment is a condition precedent to any obligation to pay petitioner participation interest.

As to the issue of reserve accounts we agree with the Tax Court; whether the finance companies maintained reserve accounts under the new agreements is of no moment. The Tax Court reasoned as follows:

> The finance companies intended to share the interest paid by the mobile home purchasers with petitioner; however, they obviously were unwilling to share interest which they did not receive due to the purchaser's default or prepayment. Economically, holding back payment to petitioner until such time as participation interest was received by the finance company served the same purpose as the creation of a reserve account.

91 T.C. at 1094. Indeed, reserve accounts are simply bookkeeping entries, and "[o]n questions concerning the taxability of income, we are to be guided by facts and not by bookkeeping entries." *Commissioner v. North Jersey Title Ins. Co.*, 79 F.2d 492, 493 (3d Cir.1935). We heed the Supreme Court's directive "that the incidence of taxation depends upon the substance, not the form, of the transaction." *Hansen*, 360 U.S. at 461, 79 S.Ct. at 1279; *accord Riley v. Commissioner*, 649 F.2d 768, 773 (10th Cir.1981) ("[T]he incidence of taxation depends on the substance of a transaction, and the government may look at the realities of a transaction to determine its tax consequences, despite the form.").

Furthermore, the 1975 contracts between petitioner and the finance companies gave the finance companies the option of establishing dealer reserve accounts. *See supra* notes 3–4. The option in the Midland agreement and the practice with Advance are evidence that operation without reserve accounts was in substance no different from operating with reserve accounts from petitioner's point of view. The internal procedures of the finance companies cannot determine how petitioner should report its taxable income.

In support of its argument that it had no fixed right to receive the participation interest until the mobile home purchasers made their monthly interest payments, petitioner relies upon *United States v. General Dynamics Corp.*, 481 U.S. 239, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987). That case held that under the "all events" test, a "liability must be firmly established" and not a mere forecast based upon actuarial data before a taxpayer can deduct an anticipated expense. *Id.* at 243, 107 S.Ct. at 1736.

We agree with the Tax Court that petitioner's right to receive participation interest was firmly established upon sale of the consumer paper to a finance company. The finance company was legally obligated to pay the participation interest to petitioner when it bought the consumer paper. Although duty of the finance company to make payment was deferred until it received payment from the purchasers, both the mobile home purchasers and the finance companies were obligated to make their respective payments. Petitioner was not required to take any additional action in order to receive the participation interest.

■ Although the exact amounts that petitioner would eventually receive varied based upon time of payment, prepayments and defaults, similar contingencies existed under *Hansen*. *See Hansen*, 360 U.S. at 459 & n. 8, 465, 79 S.Ct. at 1278 & n. 8, 1281; *see also Morgan*, 277 F.2d at 153 (actual payments subject to debits for prepayments); *Wiley*, 266 F.2d at 49 (same); *Shapiro*, 295 F.2d at 307 (actual payments subject to debits for prepayments and defaults); *Klimate Master, Inc.*, 42 T.C.M. (CCH) at 89 (same). We agree with the Tax Court that "[a]n accrual basis taxpayer must report income in the year the right to such income accrues, despite the necessity for mathematical computations or ministerial acts." 91 T.C. at 1095 (citing *George K. Herman Chevrolet, Inc.*, 39 T.C. 846, 850 (1963)); *Continental Illinois Corp.*, 61 T.C.M. (CCH) 1916, 1946 (1991) (same); *see also Continental Tie & Lumber Co. v.*

*United States*, 286 U.S. 290, 295–97, 52 S.Ct. 529, 530–31, 76 L.Ed. 1111 (1932) (must report accrued income though must estimate amount and ministerial acts remain).

■ The language of the 1975 agreement with Midland may be characterized as technically creating a condition precedent, but in substance it is no different from the prior agreements with reserve accounts; petitioner still will receive participation interest less any amount of interest not actually paid due to prepayment or default. That the participation interest is to be paid petitioner when interest is paid to the finance company in reality is an issue of timing and does not make the payment of participation interest less certain or genuinely conditional. Artful drafting cannot defeat the "all events" test. A simple word change without a change in substance cannot alter the income reporting requirements. *See Hansen*, 360 U.S. at 467, 79 S.Ct. at 1282; *see also id.* at 461, 79 S.Ct. at 1279 (substance not form is determinative); *Riley*, 649 F.2d at 773 (same). We agree with the Tax Court that upon the sale of the consumer paper to finance companies, petitioner had a fixed right to receive the participation interest.

### C

■ Next, we must consider the Tax Court's finding that the amount of income petitioner would receive from the participation interest could be determined with reasonable accuracy. The Tax Court found that "both the amount of interest to be earned on each individual contract of new consumer paper and the participation interest could be reasonably estimated by using an amortization schedule which assumed that all required payments would be made every 30 days." 91 T.C. at 1089–90. Petitioner itself stipulated to that effect. I R. doc. 6A, ¶ 42. In fact, petitioner kept records reflecting such calculation. *See* III R. ex. 23–W, 24–X, 25–Y; II R. 102–09. Before the tax years at issue petitioner

apparently had no trouble calculating the participation interest to include in its accrued income. The only difference under the amended Colorado law and new agreements is that participation interest may vary based on whether mobile home purchasers make their monthly payments on time, early, or late. Certainly some payments will be early and others late but on the aggregate petitioner should be able to reasonably estimate interest amounts in advance. Moreover, as the Tax Court noted, when "an amount of income is properly accrued on the basis of a reasonable estimate and the exact amount is later determined, any difference may be included in income or deducted, as appropriate, in the year in which the correct amount is determined." 91 T.C. at 1095 (citing Treas.Reg. § 1.451–1(a); *Continental Tie*, 286 U.S. at 290, 52 S.Ct. at 529). We affirm the Tax Court ruling on the tax treatment of participation interest.

### III

■ Finally, the Tax Court determined that petitioner improperly received a $9,302 tax refund for the 1980 tax year and found that the Commissioner was "entitled to the asserted $9,302 increase in deficiency for such year." 91 T.C. at 1096. Petitioner argues that Commissioner failed to carry the burden of proof under Tax Court Rule of Practice & Procedure 142(a) to prove this added deficiency. We do not consider the burden of proof issue because, despite language in its opinion,[6] the Tax Court did not increase petitioner's deficiency.

In the Rule 155 computation of petitioner's tax deficiency, adopted by the Tax Court in its final decision of July 20, 1990, the carry-back of net operating loss claimed in petitioner's amended tax return, I R. doc. 9, ex. A, was considered and in fact resulted in a decreased tax deficiency. It is unclear to us what petitioner complains of and what relief it seeks. If petitioner is arguing that we should not consider the information contained in the amend-

---

**6.** We believe the Tax Court's language merely recognized that, based upon its holding that petitioner had a tax deficiency for 1980, any refund was erroneous and must be considered in the final tax liability calculation.

ed tax return, which the Commissioner relied upon in its amended answer, we would be required to increase petitioner's deficiency back to the original $156,858 claimed in the notice of deficiency, *see* I R. doc. 2, ex. A, and original answer, *see* I R. doc. 4, ¶ 2 & ex. A, instead of the $147,503 approved by the Tax Court in its decision. *See* I R. doc. 25; *see also* I R. doc. 20 at 3–4 (showing Commissioner's computations arriving at $147,503 amount). If petitioner is asking that we reject all the new allegations found in the amended answer, again we would be left with the original tax liability of $156,858. Petitioner surely would not have us increase the tax liability against it.

Petitioner argues in its reply brief in a footnote that "[a]lthough not material, the refund, in fact, has not been paid." Reply Brief for Appellant at 10 n.*. If petitioner has not received the tax refund amount, it should have raised the issue, at the latest, by objecting to the Rule 155 computation as inaccurate instead of filing a Notice of No Objection. *See* I R. doc. 24.

AFFIRMED.