108 T.C. No. 22


UNITED STATES TAX COURT


RAMEAU A. AND PHYLLIS A. JOHNSON, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 16038-93, 16039-93,        Filed June 16, 1997.
          17007-93, 14430-94.


        Ds sold multiyear vehicle service contracts
(VSC's) in connection with the sale of motor vehicles
under a common program administered by A, an unrelated
party.  Under the terms of the program, Ds retained a
portion of the contract price as their profit and
remitted the remainder to A:  (1) For deposit of a
specified amount in escrow to fund their obligations
under the VSC, and (2) for payment of A's fees and a
premium for excess loss insurance provided by an
unrelated insurance company.  Ds currently included in
gross income only the portion of the contract price
that they retained as profit.  Ds reported amounts held
in escrow only when released to them.

---

        [1] Cases of the following petitioners are consolidated
herewith:  Thomas R. and Karon S. Herring, docket No. 16039-93;
DFM Investment Co., docket No. 17007-93; and David F. and
Barbara J. Mungenast, docket No. 14430-94.

<u>Held</u>:

1.(a)  At the time Ds sold a VSC they acquired a fixed right to receive, and must currently include in gross income, the portion of the contract price deposited in escrow.  The reasoning of <u>Commissioner v. Hansen</u>, 360 U.S. 446 (1959), controls.

(b)  This amount did not constitute a purchaser deposit.  <u>Commissioner v. Indianapolis Power & Light Co.</u>, 493 U.S. 203 (1990), distinguished.

(c)  Nor did this amount constitute a trust fund for the benefit of the purchaser.  <u>Angelus Funeral Home v. Commissioner</u>, 47 T.C. 391 (1967), affd. on other grounds 407 F.2d 210 (9th Cir. 1969), and <u>Miele v. Commissioner</u>, 72 T.C. 284 (1979), distinguished.

2.  Pursuant to secs. 671 and 677, I.R.C., Ds are treated as owners of the escrow accounts and must currently include investment income of the accounts in gross income.  Effect of sec. 468B(g), I.R.C., explained.

3.  Premiums are capital expenditures that must be recovered through amortization.  Fees are deductible in accordance with a formula that reasonably measures A's performance of services over the life of the VSC's.  Ds may not either currently deduct these payments to offset income they are required to recognize with respect to the corresponding portions of the contract price or defer recognition of income until the offsetting deductions are allowable.

4.  An adjustment under sec. 481, I.R.C., is sustained.

<u>Kenneth G. Kolmin</u>, <u>Francis J. Emmons</u>, and <u>Aaron E. Hoffman</u>, for petitioners.

<u>Karen J. Goheen</u> and <u>Elsie Hall</u>, for respondent.

BEGHE, Judge:  Respondent determined deficiencies in petitioners' Federal income tax, additions to tax and penalties as follows:[2]

Rameau A. Johnson and Phyllis A. Johnson (the Johnsons), docket No. 16038-93.

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1991 | $4,097 | $819 |

Thomas R. Herring and Karon S. Herring (the Herrings), docket No. 16039-93.

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1991 | $2,093 | $419 |

DFM Investment Co., d.b.a. St. Louis Honda, docket No. 17007-93.

| Year Ended | Deficiency | Addition to Tax Sec. 6653(a) | Penalty Sec. 6662(a) |
|------------|-----------|------------------------------|----------------------|
| Mar. 31, 1989 | $2,285 | $114 | - 0 - |
| Mar. 31, 1990 | 110,378 | - 0 - | $22,076 |
| Mar. 31, 1992 | 34,686 | - 0 - | 6,937 |

David F. Mungenast and Barbara J. Mungenast (the Mungenasts) docket No. 14430-94.

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|----------------------------------|----------------------|
| 1990 | $355,623 | $27,492 | $71,125 |
| 1991 | 84,431 | 5,316 | 16,886 |

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

These cases were consolidated for trial, briefing, and opinion by reason of the presence of common issues regarding the methods used by certain motor vehicle dealerships to report income and expense on the sale of multiyear vehicle service contracts (VSC's). In docket Nos. 16038-93, 16039-93, and 17007-93 all the adjustments are attributable to these common issues. In docket No. 14430-94 only the adjustments related to the tax treatment of VSC's have been consolidated; the remaining adjustments were settled by the parties separately. Prior to trial, respondent revised the adjustments on the basis of more complete information, as a result of which the deficiencies now asserted are lower than those set forth in the notices of deficiency. Respondent has also conceded the addition to tax under section 6653(a) in docket No. 17007-93 and penalties under section 6662(a) in all dockets to the extent attributable to the consolidated issues. The issues that remain for decision are:

1. Whether accrual basis motor vehicle dealerships may exclude from gross income for the year of the sale of a VSC that portion of the contract price that they were required to deposit in escrow to secure their obligations under the contract;

2. whether the dealerships may exclude from gross income the investment income earned by the funds held in escrow; and

3. whether the dealerships may exclude or deduct from gross income for the year of the sale of a VSC those portions of

the contract price that they remitted to third parties as prepayments of service fees for administration of the VSC program and an insurance premium for indemnification of their losses under the program. If respondent prevails on these issues, we must further decide whether the income of one of the dealerships is subject to an additional adjustment pursuant to section 481.

We hold that the dealerships' method of accounting for VSC's was not a proper application of the accrual method, and, except in regard to the treatment of the dealerships' administrative fee expenses, we sustain respondent's revised adjustments in full.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated by this reference. At the times they filed their petitions, the Johnsons, the Herrings, and the Mungenasts were residents of, and DFM Investment Co. maintained its principal place of business in, the State of Missouri. The relationships between petitioners and the dealerships whose method of accounting for VSC's is the subject of controversy in these cases (collectively, the Dealerships) are set forth below:

| Corporate Name | Doing Business As | Tax Status During Taxable Yr.(s) At Issue | Petitioners Owning Shares |
|---|---|---|---|
| DFM Investment Co. | St. Louis Honda | Subchapter C corp. | David Mungenast (at least 82%) |
| DRK Investment Co. | St. Louis Acura | Subchapter S corp. | David Mungenast (100%) |
| Capco Sales, Inc. | St. Louis Lexus | Subchapter S corp. | David Mungenast (100%) |

| | | | |
|---|---|---|---|
| MAD Investment Co. | Alton Toyota/Dodge (prior to 1991) | (not in evidence) | David Mungenast (not in evidence) |
| DAR, Inc. | Alton Toyota/Dodge (beginning 1991) | Subchapter S corp. | David Mungenast (50%), Rameau Johnson (33%), Thomas Herring (17%) |

During the years at issue, the four Dealerships offered VSC's under a common program in conjunction with the sale of new and used motor vehicles. Before October 1991 the program was administered by Mechanical Breakdown, Inc. (MBP), a corporation unrelated to petitioners. From October 1991 through March 1992, the program was administered by Automotive Professionals, Inc. (API), also unrelated to petitioners, but the structure and operation of the program remained, in all material respects, substantially unchanged.[3] A standard form of VSC recites that it is a contract between the issuing dealer and the motor vehicle purchaser (referred to in some contracts as the "contract holder"). Under the terms of the VSC, the dealer agrees, for a fixed price, to

> make repairs or replace any of the below listed parts
> or components of the Contract Holder's Vehicle covered
> hereunder or cause such repairs or replacement to be
> made by an authorized repair facility at no cost for
> parts or labor to the Contract Holder (but subject to
> applicable deductible, if any) whenever covered
> components or parts in the Contract Holder's said
> Vehicle experience a Mechanical Breakdown.

---

[3] MBP continued to administer contracts sold before October 1991. All contracts sold thereafter were administered by API. Where a distinction is appropriate, we will refer to "the program administered by MBP" and "the program administered by API."

The parties agree that the full purchase price of the VSC was due and collected at the time of sale.[4]

The VSC purchaser can select the term of coverage he desires from a range of options, each defined by reference to a specified time or mileage limitation, whichever is reached first. Approximately three-quarters of the contracts sold by the Dealerships during the years at issue provided coverage for at least 5 years or 60,000 miles. However, the aggregate limit of a dealer's liability is fixed in some of the contracts as the value of the vehicle at the time of purchase and in the rest of the contracts as the lesser of the value of the vehicle at the time of purchase or $10,000.

The VSC provides that

A specific amount of the Contract purchase price shall be held in escrow in accordance with and as specified in Automotive Professionals, Inc.'s Administrator Agreement, a copy of which is available from the Dealer. Said amount shall be paid directly to the escrow account established by the Administrator and

---

[4] Purchasers had the option to finance the contract by adding the purchase price to the installments payable for the vehicle. Although the details of the financing arrangements are not disclosed by the record, presumably the Dealership would immediately assign the purchaser's installment obligation to a finance company for cash, in accordance with the conventional practice for financed sales of motor vehicles. See Commissioner v. Hansen, 360 U.S. 446 (1959); Resale Mobile Homes, Inc. v. Commissioner, 91 T.C. 1085 (1988), affd. 965 F.2d 818 (10th Cir. 1992). Neither party suggests that the tax treatment of VSC's should be affected by the use of financing. The parties' stipulations and arguments on brief assume that the full contract price was due and paid in cash at the time of the sale. For convenience of analysis, we do so also.

> Brokerage Professionals, Inc., the Escrow Trustees.
> * * *  All amounts placed in escrow, together with
> accrued investment income, shall constitute a Primary
> Loss Reserve Fund (the "Reserves") for payment of
> claims covered by the Contract.  Dealer further agrees
> to provide an insurance policy with the Travelers
> Indemnity Company to cover claims in excess of the
> Reserves and continue to maintain said policy in force
> during the term of this Contract.

The purchaser is directed to return the vehicle to the dealer in the event of a mechanical breakdown.  Repairs performed by another repair facility are not covered by the contract unless the purchaser secures the Administrator's prior authorization. When the Administrator authorizes covered repairs by another repair facility, the Administrator arranges for payment of the claim from the Primary Loss Reserve Fund (PLRF) on the dealer's behalf.

The purchaser is entitled to cancel the VSC at any time upon payment of a nominal service charge.  The purchaser's cancellation rights are spelled out in the contract as follows:

> 1.  This contract may be cancelled and the entire
> Contract purchase price will be refunded by the Dealer
> to the Contract Holder/lienholder if notice of
> cancellation is given during the first sixty (60) days
> provided a claim has not been filed hereunder.
>
> 2.  If a claim was authorized during the first sixty
> (60) days or if a cancellation is requested after the
> first sixty (60) days, the pro-rata unearned Contract
> purchase price will be refunded by the Dealer to the
> Contract Holder/lienholder based on the greater of the
> days in force or the miles driven related to the terms
> of this Contract.

The purchaser's rights against other entities participating in the program that are not parties to the contract is expressly limited:

> The Administrator does not assume and specifically disclaims any lability to the Purchaser. The liability of the Administrator is to the issuing Dealer only in accordance with their separate agreement. If the dealer fails to pay an authorized covered claim within sixty (60) days after proof of loss has been filed or, in the event of cancellation, the dealer fails to refund the unearned portion of the consideration paid, the purchaser is entitled to make a claim directly against the Travelers Indemnity Company * * * through its managing agent.

Each Dealership also entered into an Administrator Agreement. The other parties to the agreement were MBP or API, the Travelers Indemnity Co. (Travelers), and Travelers' managing agent during the years at issue, Brokerage Professionals, Inc. (BPI), referred to in the agreement as Administrator, Insurer, and Managing Agent, respectively. The Administrator Agreement provides for the establishment of "one or more trust funds or custodial accounts with financial institutions and/or money market funds in the name of the Administrator and Managing Agent as Escrow Trustees (the `Escrow Account(s)')." Under the program administered by API, a separate account was established in the name of the Trustees for each Dealership at a bank called the Massachusetts Co. Under the program administered by MBP, the Trustees, in the exercise of their discretion, maintained all reserves deposited by the Dealerships in a single account at the

Mercantile Bank of St. Louis. In order to implement the provisions of the Administrator Agreement for release and forfeiture of reserves, it would nevertheless have been necessary to account for the reserves attributable to each Dealership separately. The Administrator Agreement states:

> All reserves in the Escrow Account(s) shall be held for the primary benefit of Contract holders to secure Dealer's performance under the Contracts and to pay for valid claims arising under the Contracts. Dealer shall have no beneficial or other property interest in the Reserves or investment income in the Escrow Account(s); nor can Dealer assign, pledge or transfer such Reserves.

The disposition of the purchase price collected from the contract holder was subject to detailed procedures set forth in the Administrator Agreement. The Dealership retained a portion as its profit. Of the remainder, specified amounts were payable to the PLRF as reserves, to Travelers as a premium for excess loss insurance over the full term of the contract (Premium), to MBP or API as a fee for administrative services (Fees), and to each of BPI and the company that marketed the VSC program on the Administrator's behalf as a commission (Commissions). The Administrator Agreement provides that "Dealer agrees to accept and hold such monies as a fiduciary in trust and shall be responsible for the proper and timely remittance of the same to the Administrator, Managing Agent or Escrow Accounts(s)." The PLRF deposits, Premiums, Fees, and Commissions payable with respect to all VSC's sold during a given month were required to

be remitted by check to the Administrator no later than the 15th day of the following month, together with a remittance report summarizing VSC sales during the month. After verification and processing of the information contained in the remittance reports, the Dealerships' payments were distributed appropriately.

The Administrator Agreement provided for the refund of these payments in the event that the VSC was canceled in accordance with its terms. The "unearned" portions of: (1) Reserves attributable to the canceled contract (exclusive of any investment income), (2) the Fees, (3) the Premium, and (4) the Commissions were refunded to the dealer, who then would forward the combined amounts of these refunds, plus the "unearned" portion of its profit on the sale to the purchaser.

The Dealerships' access to the reserves held in escrow was strictly controlled. Under the Administrator Agreement, release of reserves to a dealer required the approval of both Escrow Trustees and was limited to the following circumstances:

1. When the dealer had performed repairs for a contract holder, it was entitled to compensation at standard rates for parts and labor.

2. When a VSC sold by the dealer was canceled in accordance with its terms, the dealer was entitled to the return of the amount it owed to the contract holder.

3.  When a VSC sold by the dealer expired, the dealer was entitled to the release of unconsumed reserves attributable to that contract, subject to certain limitations.  First, under the program administered by MBP, corpus and investment income of the PLRF were separately accounted for, and the dealer was not entitled to release of the investment income portion of the unconsumed reserves.  This limitation was relaxed under the program administered by API; corpus and income were available for release to the dealer on the same terms.  Second, a dealer forfeited its right to unconsumed reserves attributable to a contract if it committed certain specified acts of default: Failure to achieve a minimum sales quota in the year the contract was sold, breach of the Administrator Agreement, bankruptcy, termination of participation in the program without achieving a minimum balance in its PLRF account, dissolution without a successor in interest, and the like.  Third, no unconsumed reserves were released unless, in the judgment of the Escrow Trustees and Travelers, the dealer's account balance would remain at an actuarially safe level for satisfaction of the dealer's obligations under all unexpired contracts.  It was Travelers' policy to approve release of unconsumed reserves only to the extent that the particular dealer's loss to earned reserve ratio did not exceed 70 percent.

The Administrator Agreement provided for release of reserves to other parties under the following circumstances:

1. When a claim for covered repairs was submitted by an authorized repair facility other than the dealer that sold the VSC, the Administrator withdrew funds for payment.

2. Under the program administered by MBP, investment income not used to pay claims or refunds was payable to the Administrator upon expiration of the contract to which it was attributable, provided that the dealer's account would remain at an actuarially safe level.

3. Upon expiration of all the contracts of a dealer and payment of all claims, any unconsumed reserves that the dealer had forfeited for one reason or another became the property of the Administrator.

4. Travelers was entitled to reimbursement from a dealer's account in the event that it was required to pay a claim or refund by reason of the dealer's delinquency or default.

Pursuant to the Administrator Agreement, the Dealerships were subject to audit by the Administrator, BPI, and Travelers to verify that their requests for disbursements from the PLRF accounts complied with these terms.  An audit of Alton Toyota/Dodge in January 1992 called certain claims for repairs into question and resulted in restitution of payments to the PLRF.  The parties agree that otherwise all payments of reserves to the Dealerships during the years at issue were made strictly in accordance with the terms of the Administrator Agreement.

The Administrator Agreement imposed upon the Escrow Trustees a duty to report the status of the PLRF accounts to the other parties to the agreement on a monthly basis.  Inasmuch as the VSC purchasers were not parties to the agreement, the Trustees were not required to report to them.

A separate Escrow Agreement was entered into between the Escrow Trustees and either Mercantile Bank of St. Louis or Massachusetts Co., acting as the escrow depository.  The Escrow Agreement provides that the bank will establish Primary Loss Reserve Fund escrow accounts "for the Dealer Group", and that "each dealer depositor will be insured pursuant to the regulations and rules adopted from time to time by F.D.I.C."

Under Automobile Dealers Service Contract Excess Insurance policies issued by Travelers, each of the Dealerships was entitled to indemnification for covered losses exceeding the

aggregate amount of reserves deposited by the Dealership in the PLRF plus the accumulated investment income. The excess loss insurance policies were renewed on an annual basis throughout the period at issue.

In 1987, the Dealerships began offering VSC's under the program outlined above. Until a few years before, dealerships in which petitioner David Mungenast held an interest had sold similar vehicle service contracts under a program administered by a company called North American Dealer Services, Inc. (NADS). It appears that under that program amounts paid by the dealerships to NADS to insure their losses had been subject to NADS' unfettered control. NADS had gone bankrupt, causing the Dealerships to sustain heavy losses honoring their contractual obligations without indemnification. The program administered by MBP and API was designed to offer dealerships greater security than the NADS program. In marketing the program to the Dealerships, salesmen for MBP stressed the security provided by the escrow arrangement and by Travelers' reputation as a major insurance company. In his decision to adopt the MBP program for the Dealerships, David Mungenast attached considerable significance to these characteristics.

The Dealerships evidently believed that Travelers' participation in the program would be important to their customers. Promotional literature for the program that the

Dealerships distributed to their customers emphasized that "Insurance for this plan is provided by one of the six largest property and casualty insurance companies in the United States", and the manager of Alton Toyota/Dodge during the years at issue kept a red Travelers umbrella in his office to use as part of his sales presentation. On the other hand, neither the manager of Alton Toyota/Dodge nor the salesmen of the Dealerships generally called attention to the PLRF arrangement in their presentations to customers and did not show them the Administrator Agreement that governed the PLRF arrangement. No contract holder has ever requested API to furnish information regarding the status of a PLRF account.

All of the Dealerships maintained their books and records under the accrual method of accounting. On their Federal income tax returns for each of the years at issue, the Dealerships reported as income from the sale of VSC's only that portion of the contract price that they retained as profit. The PLRF accounts were not reflected on the Dealerships' returns for these years, and the income earned by investment of these reserves was not currently included in their gross income. The Dealerships included reserves in income only when, and to the extent, paid to them from the PLRF accounts.

For calendar year 1992 and subsequent years, the Escrow Trustees have filed Forms 1041, U.S. Fiduciary Income Tax Return,

with respect to each of the PLRF accounts.  These returns treat the investment income as if the PLRF accounts were complex trusts.  The Escrow Trustees were of the opinion that this treatment was required by final regulations under section 468B issued in December 1992.

Respondent determined that the Dealerships' method of accounting for the VSC's did not clearly reflect income because it resulted in omission of items of income and premature deduction of some items of expense.  Respondent computed adjustments to their income for each of the years at issue in a manner designed to result in inclusion of the full purchase price of contracts sold during the year and deferral of deductions for related expenses until later years.  Respondent further required the Dealerships to include in income their respective shares of the investment income of the PLRF accounts as it accrued. Finally, respondent included in the income of certain Dealerships an additional amount pursuant to section 481.  Only the section 481 adjustment asserted against DFM Investment Co. is at issue in these proceedings.

OPINION

1.   Portion of Contract Price Deposited in the PLRF

     a.   Respondent's Theory

Section 451(a) provides that the amount of any item of income shall be included in gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, the amount is properly accounted for as of a different period.  Under the accrual method of accounting, income is includable for the taxable year when all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy.  Secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs.  Generally, all the events that fix the right to receive income have occurred when it is:  (1) Actually or constructively received; (2) due; or (3) earned by performance, whichever comes first.  Schlude v. Commissioner, 372 U.S. 128 (1963); Union Mut. Life Ins. Co. v. United States, 570 F.2d 382, 385 (1st Cir. 1978); Automobile Club of New York, Inc. v. Commissioner, 32 T.C. 906, 911-913 (1959), affd. 304 F.2d 781 (2d Cir. 1962).

A line of cases beginning with Commissioner v. Hansen, 360 U.S. 446 (1959), expounds the conditions under which a taxpayer's right to receive income becomes fixed where payment to the taxpayer is withheld or deposited in a reserve account.  The

taxpayers in <u>Hansen</u> were accrual basis retail dealers who sold automobiles and house trailers on credit and then assigned the consumer installment paper to a finance company, guaranteeing the consumer's payment. The finance company paid the dealer cash equal to the face amount of the installment paper less a specified percentage that the finance company credited to a reserve account and withheld as collateral to secure the dealer's guaranty and other obligations to the finance company. Periodically the finance company released to the dealer amounts in the reserve exceeding a stated percentage of the unpaid balances on installment paper purchased from the dealer. On their tax returns the dealers currently included in income only the amounts paid to them by the finance company. The dealers contended, first, that they had no right to receive amounts that they could not currently compel the finance company to pay them; second, their right to receive reserves did not become fixed so long as the amount that they would ultimately recover was subject to their contingent liabilities to the finance company. Accordingly, the dealers argued, there was no basis for accrual of the reserves as income for the year in which the reserves were withheld and credited to the dealer's account.

The Supreme Court rejected the dealers' first argument, stating that, under the accrual method, it was the time of acquisition of the fixed right to receive the reserves, not the

time of their actual receipt, that controlled when the reserves must be reported as income. Id. at 464. In reply to the dealers' second argument, the Court observed that only one of two things could happen to the reserves: Either they would be paid to the dealer or applied in satisfaction of the dealer's obligations to the finance company. As the dealer would thus effectively receive the entire amount of the reserves in all events, the right to receive the reserves was not conditional but absolute at the time they were withheld and credited to the dealer's account, and the dealer accordingly realized income at that time. Id. at 465-466.

In General Gas Corp. v. Commissioner, 293 F.2d 35 (5th Cir. 1961), affg. 33 T.C. 303 (1959), the taxpayer was a natural gas distributor that sold the installment paper generated by sales of tanks and appliances to its customers to a finance company for a price equal to its face amount, which included finance charges payable ratably over the full term of the installment contract. The finance company paid the taxpayer only 90 percent of the merchandise price, withholding the remaining 10 percent plus the amount of the finance charges in a dealer reserve account to secure the taxpayer's guaranty of payment on the installment paper. The taxpayer did not currently include the reserves in its income. Affirming this Court, the Court of Appeals followed Hansen, reasoning that since the entire amount of the reserves

would eventually either be paid to the taxpayer or used to discharge its liabilities, the taxpayer had a fixed right to receive, and must currently include, amounts credited to its reserve account.  The Court of Appeals rejected the taxpayer's argument that Hansen was distinguishable because the reserves represented, in part, finance charges that the taxpayer would have reported as income ratably over the term of the installment contract, as earned, if it had retained the customer's installment paper.  The Court of Appeals was not persuaded that the finance charges included in the consideration for the sale of the paper should be accounted for in the same manner as finance charges earned and received over time by the holder of the paper. The Court of Appeals reasoned that the taxpayer materially altered its economic position by selling the paper.  Not only did it reduce its risk exposure; it also benefited by receiving immediate credit for an amount corresponding to the full amount of the finance charges and, depending on the balance in its account, the credits could produce distributable cash long before the installments would be collectible from the consumer.  Id. at 41.

Since General Gas Corp. v. Commissioner, supra, the courts have repeatedly held that accrual basis retailers must currently include the portion of the amount realized on the sale of installment paper attributable to "participation interest", even

though it is withheld in a reserve account to secure the retailer's guaranty obligations and is subject to forfeiture to the extent that the interest otherwise payable to the finance company under the installment paper is either abated, as a result of the consumer's prepayment of the balance of his debt, or becomes uncollectible.  Resale Mobile Homes, Inc. v. Commissioner, 965 F.2d 818 (10th Cir. 1992), affg. 91 T.C. 1085 (1988); Shapiro v. Commissioner, 295 F.2d 306 (9th Cir. 1961), affg. T.C. Memo. 1959-151; Federated Dept. Stores, Inc. v. Commissioner, 51 T.C. 500 (1968), affd. on other issues 426 F.2d 417 (6th Cir. 1970); Klimate Master, Inc. v. Commissioner, T.C. Memo. 1981-292.

The principles enunciated in the dealer reserve cases have been affirmed in other multiparty transactions in which payments to the taxpayer are withheld or deposited in reserve as security for the taxpayer's executory obligations.  Thus, in Stendig v. United States, 843 F.2d 163 (4th Cir. 1988), an accrual basis taxpayer that constructed and operated a low-income apartment complex financed by the Virginia Housing Development Authority (VHDA) was required to secure both its loan from VHDA and its obligations to maintain and operate the complex by depositing a portion of the rents collected from tenants into reserve accounts under VHDA's control.  The Court of Appeals held that the rule of Hansen required the taxpayer to include the rent deposits in

income when collected. Although the amount of the reserves that the taxpayer would ultimately recover was not ascertainable at the time of deposit, in all cases disposition of the reserves would inure to the taxpayer's benefit, and therefore the right to receive was fixed. See also Bolling v. Commissioner, 357 F.2d 3 (8th Cir. 1966), affg. in relevant part and revg. and remanding on other issues T.C. Memo. 1964-143.

Respondent's position is that the cases at hand are controlled by the Hansen line of cases. Respondent argues that the Dealerships acquired a fixed right to receive the full purchase price of the VSC at the time of the sale, even though they were required by contract immediately to deposit a portion in an escrow account. We agree.

Petitioners take the position that amounts deposited by a Dealership in the PLRF were not includable in its gross income unless or until actually released to the Dealership as payment for covered repairs or, upon expiration of the VSC, as unconsumed reserves. Petitioners reason as follows: the VSC's are executory contracts. The issuing Dealership earned the amounts required to be paid under their terms through performance. At the time the VSC's were entered into, the issuing Dealership had not earned and was not entitled to be paid any portion of the funds required to be held in escrow. The first time the issuing Dealership had any right to this portion of the contract holder's

payment was when (or if) it made repairs covered by the terms of the VSC. If no such repairs were made, the money remained in escrow until the VSC expired, and even then would not be paid to the issuing Dealership unless all of the conditions for a release of unconsumed reserves were met.

There are a number of problems with petitioners' argument. First, it confuses the right to receive with both earning through performance and the right to present payment. Each of these rights is independently sufficient to require accrual under the all events test. Schlude v. Commissioner, 372 U.S. 128 (1963); Automobile Club of New York, Inc. v. Commissioner, 32 T.C. at 911-913. That the Dealerships could not compel the Escrow Trustees to pay reserves from the escrow accounts does not control the determination of whether the Dealerships had a fixed right to receive them. Commissioner v. Hansen, 360 U.S. at 464. Nor is it dispositive that the Dealerships had not performed any repair services under the VSC's at the time they collected the purchase price and deposited it in escrow. Petitioners' confusion on this point causes them to misread the relevant case authorities. Thus, they argue that the fact that the cases at hand concern executory service contracts distinguishes them materially from the Hansen line of cases:

> Hansen and Resale Mobile Homes both involve the sale of retail installment contracts. In the context of a sale of property, these cases held that the taxpayers had to currently recognize the agreed purchase price for the

installment contracts as income at the time of sale since the transfer of the <u>property</u> by them to their respective purchasers established their right to be paid.  Here, in contrast, we are dealing with <u>executory service</u> <u>contracts</u> which can be terminated at will by the Contract Holder.  At the time the VSC is entered into, the Dealerships have only a conditional right to receive a portion of agreed purchase price, and no right to receive the amount required to be held in Escrow.  This fundamental difference undoes all of Respondent's argument based on <u>Hansen</u> and <u>Resale Mobile Homes</u>.

The distinction that petitioners draw between executory service contracts and completed sales of property misrepresents the issue in the dealer reserve cases and their holdings.  If the transactions at issue in those cases had simply been closed and completed sales of property, then no portion of the purchase price would have been withheld in reserve.  The dealer reserves were established precisely for the purpose of securing <u>executory</u> obligations of the taxpayer as guarantor of future payments on the installment paper.  The cases held that the taxpayer acquired a fixed right to receive the reserves notwithstanding the possibility that, as guarantor of the consumer's performance, the taxpayer would forfeit some or all of the reserves to the finance company in the event that the consumer defaulted or paid off the balance of the loan prematurely, terminating the installment contract before the scheduled interest was earned.

Another problem with petitioners' argument is that it assumes that the proper method of reporting income from the sale of VSC's is the same as the method the Dealerships are entitled

to use to report income from repairs that they perform on a fee-for-service basis.  In making this assumption they fail to appreciate that the economic position of the Dealership (as well as that of the customer) is materially different in the two situations.  When the Dealership sells a motor vehicle without a VSC, the income it may earn from servicing the vehicle is contingent in both time and amount; the Dealership would properly report income in the future as earned by performance of services. It would be impracticable to accrue this contingent service income in the year the vehicle is sold, and the conditions for inclusion in gross income under the all events test would not be satisfied.  By contrast, when the Dealership sells a vehicle together with a VSC, it assumes the obligation to perform or finance all covered repairs that may be required over a defined term in exchange for a fixed price.  The sale of the contract effects a transfer to the Dealership of the risk that the actual cost of servicing the vehicle over this term will be greater or less than the fixed price.  Thus, the VSC is not a contract for the sale of specific future services, as petitioners characterize it, but a service warranty.  The purchase price of the contract likewise corresponds not to the cost of any particular repair jobs that the Dealership may be called upon to perform in the future, but to the cost of assuming a defined risk.

It is undisputed that the full contract price was due and collected at the time the VSC was sold. The timing of the purchaser's performance is consistent with the distinctive economics of the VSC arrangement. The purchaser agrees to part with his money in advance of any repair services because the benefit for which he is paying is the transfer of risk effective upon execution of the contract. The Dealership demands the full contract price in advance of repair services because it has begun to perform when it accepts this risk.

The economic consequences to the Dealership of selling a service warranty under the VSC arrangement are not the same as the economic consequences of selling repair services on a fee-for-service basis. The sale converts contingent future payments into a fixed cash deposit immediately available for satisfaction of the Dealership's liabilities to all its contract holders. The deposit is invested and earns income that is accumulated on the Dealership's behalf. If the actual cost of repairs under the Dealership's contracts turns out to exceed the deposits plus accumulated investment income in its account, and the Dealership has failed to insure itself or to comply with the terms of the insurance policy, the Dealership will bear the loss. On the other hand, if the actual cost of repairs turns out to be less than the reserves, some or all of the unconsumed reserves revert to the Dealership. The credit that the Dealership receives for

each contract sold counts toward satisfaction of the minimum sales quota that must be achieved for the year in order to qualify for release of unconsumed reserves attributable to any contracts sold during the same year; it also contributes toward the minimum account balance required in order to receive unconsumed reserves attributable to currently expiring contracts. In brief, the many distinctive benefits and risks of the VSC arrangement for the Dealership are attributable to the form of a present sale in which it is cast:  "It is the sale itself which makes a difference."  General Gas Corp. v. Commissioner, 293 F.2d at 41.  Therefore, it is entirely appropriate to treat the arrangement as a present sale for Federal income tax purposes, with consideration received up front in the form of cash and reserve credits.  Cf. id.; Klimate Master, Inc. v. Commissioner, T.C. Memo. 1981-292 (both discussing significance for tax treatment of finance charges of distinction between holding installment paper and selling it).

Like the taxpayers in the Hansen line of cases, petitioners argue that the inability of the Dealership to predict at the time it sold a VSC how much of the reserve it would ultimately recover, either through performance of repairs or upon expiration of the contract, precludes satisfaction of the necessary conditions for accrual under the all events test.  They attempt to distinguish Hansen on the ground that in that case the funds

in the dealer reserve account would in all events either be paid to the taxpayer or be applied in satisfaction of his obligations, whereas in the cases at hand the reserves might have been disposed of in a manner that did not constitute "receipt" by the Dealership. Specifically, there were two additional possible scenarios: The reserves might be: (1) Paid to another repair facility, or (2) refunded to the purchaser upon cancellation of the contract.

The VSC imposes an obligation upon the issuing Dealership either to perform covered repairs itself or to pay for covered repairs by another authorized facility. The use of the reserves to pay another authorized repair facility would discharge the Dealership's obligation and thereby constitute "receipt" within the meaning of Hansen. Commissioner v. Hansen, 360 U.S. at 465-466; cf. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729-730 (1929). The Dealership would also "receive" the reserves in the second scenario posited by petitioners. Under the VSC, like a standard contract of insurance which it closely resembles, upon notification of the purchaser's election to cancel the contract, the Dealership immediately becomes personally indebted to the purchaser for the amount of the unearned portion of the contract price. See 7 Williston on Contracts, sec. 920, at 618-619, 634 (3d ed. 1963). When the Dealership secures release of reserves

and uses them to discharge its personal indebtedness, it has plainly "received" them for purposes of the all events test.

This result is consistent with the case law on the taxation of dealer reserve accounts. As noted above, it is well established that a taxpayer that sells a consumer installment contract for a price that includes interest payable over the term of the contract acquires a fixed right to receive the amount of the purchase price attributable to the interest at the time it is credited to the taxpayer's reserve account, even though the reserve account will be charged to the extent of any interest that is abated before it is earned as a result of the consumer's decision to prepay the balance and terminate the contract prematurely. Resale Mobile Homes, Inc. v. Commissioner, 965 F.2d at 823; Shapiro v. Commissioner, 295 F.2d at 307; General Gas Corp. v. Commissioner, 293 F.2d at 39-41; Federated Dept. Stores, Inc. v. Commissioner, 51 T.C. at 502-503. We do not perceive any difference in substance between forfeiture under those conditions and forfeiture through the cancellation refund provisions of the VSC. In both situations the forfeiture constitutes an application of the funds to discharge the taxpayer's obligations, which unquestionably inures to the taxpayer's benefit; in neither situation does the existence of the contingent liability prevent the taxpayer from acquiring a fixed right to receive the amounts

subject to forfeiture when they are credited to the taxpayer's reserve account.

So long as a Dealership (including any successor in interest) remains in existence until all of its VSC's have expired, all proceeds from the sale of those contracts that it deposits in the PLRF will, as in Hansen, either be paid to the Dealership directly or be applied in satisfaction of its various liabilities under the operative agreements. The problem of prediction suggested by petitioners does not arise.

b. Petitioners' Deposit Theory

Petitioners advance two alternative theories under which the reserves would not be reportable as income to the Dealerships in the year they were collected from the purchaser. One theory characterizes the reserves as customer deposits. The authority on which they rely is the "complete dominion" test enunciated by the Supreme Court in Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990). Although petitioners do not spell out in detail how they think Indianapolis Power & Light applies, the argument seems to run as follows: inasmuch as the Dealerships collected the amounts allocable to the PLRF subject to an obligation to refund them at the purchaser's option, the Dealerships did not have "some guarantee that * * * [they would] be allowed to keep the money" as long as they complied with the terms of the contract. Accordingly, the reserves were not income

to the Dealerships until applied to future purchases of repairs or released to the Dealerships without restriction upon expiration of the contract.

In Indianapolis Power & Light the issue was whether an accrual method public utility was required to include in gross income upon receipt the amount of refundable security deposits that it required from customers with suspect credit.  The amount of the deposit was twice the customer's estimated monthly utility bill.  A customer could obtain a full refund of his deposit by demonstrating acceptable credit or by making timely payments over a specified period.  The customer could choose to receive the refund in cash or have it applied against future bills.  The Court held that the customer deposits were not advance payments for electricity and therefore not taxable upon receipt.  "The key", said the Court, "is whether the taxpayer has some guarantee that he will be allowed to keep the money."  Id. at 210.  In the case of a nonrefundable advance payment, exemplified by the fees for dancing lessons at issue in Schlude v. Commissioner, 372 U.S. 128 (1963), and subscription fees in American Auto. Association v. United States, 367 U.S. 687 (1961),

> the seller is assured that, so long as it fulfills its
> contractual obligation, the money is its to keep.
> Here, in contrast, a customer submitting a deposit made
> no commitment to purchase a specified quantity of
> electricity, or indeed to purchase any electricity at
> all.  IPL's right to keep the money depends upon the
> customer's purchase of electricity, and upon his later
> decision to have the deposit applied to future bills,

not merely upon the utility's adherence to its contractual duties. Under these circumstances, IPL's dominion over the funds is far less complete than is ordinarily the case in an advance-payment situation.

* * * * * * *

The customer who submits a deposit to the utility * * * retains the right to insist upon repayment in cash; he may choose to apply the money to the purchase of electricity, but he assumes no obligation to do so, and the utility therefore acquires no unfettered "dominion" over the money at the time of receipt. [Commissioner v. Indianapolis Power & Light Co., supra at 210-212; fn. ref. omitted.]

In subsequent cases this Court has had occasion to apply the reasoning of Indianapolis Power & Light to analogous situations. Oak Indus., Inc. v. Commissioner, 96 T.C. 559 (1991), concerned the tax treatment of a subscription television operator that collected a security deposit from all subscribers. Upon termination of service at any time by either party, if no amounts were due from the subscriber, the television company was required to refund the entire deposit. A majority of subscribers chose to apply at least a portion of the deposit to pay monthly service charges on their final bill. In holding that the deposits were not taxable income to the television company, we reasoned that the subscribers controlled whether the deposit would be refunded or applied against amounts due for services. The subscriber made no commitment to purchase a specified amount of services from the television company, or indeed to purchase any services at all.

Thus, there was no guarantee that the television company could keep the deposit.

In Buchner v. Commissioner, T.C. Memo. 1990-417, the taxpayer operated a direct mail advertising service and required its clients to make deposits into "postage impound accounts" to cover estimated postage expenses. In the event that a client failed to reimburse the taxpayer for postage, money would be withdrawn from the client's account. When a client terminated its relationship, any balance in the account not so applied was refunded. We held that the deposits were not income to the taxpayer under the "complete dominion" test, because so long as clients paid their monthly bills, no portion of the deposits would be applied to payments for services and retained by the taxpayer.[5]

Petitioners' attempt to apply the teaching of Indianapolis Power & Light to the cases at hand is self-contradictory and does not support their position on the issues in dispute. If the reserves were nontaxable deposits by reason of the Dealerships' contingent liability to refund them on demand, then they would have ceased to be deposits and become taxable income at such time

---

[5] Cf. Kansas City S. Indus., Inc. v. Commissioner, 98 T.C. 242 (1992) (railroad company did not realize income upon collection of deposits from shippers for estimated costs of sidetrack construction which railroad company agreed to refund, to the extent deposits exceeded actual construction costs, through a rebate formula based on shipping volumes).

as they became nonrefundable.  Under the VSC, the portion of the

contract price to be refunded to the purchaser on cancellation

declines in proportion to the greater of time elapsed or mileage

driven.  Yet the Dealerships did not so report the reserves on

their returns and petitioners do not argue that it would have

been appropriate for them to do so.[6]  The method of accounting

for the reserves that the Dealerships did use is inconsistent

with the characterization of these amounts as deposits.  And it

is this method, not the treatment of the reserves as deposits,

that respondent determined did not clearly reflect income.  Thus,

when carried to its logical implications, the deposit theory is

not germane to any matter in controversy.

It is worth noting, moreover, that the portion of the VSC

purchase price that the Dealerships reported as their profit on a

sale was also subject to refund on cancellation in accordance

with the same declining balance formula applicable to the

reserves.  Yet petitioners do not suggest that the Dealerships

would have been entitled to exclude their profit from gross

income on the ground that it too was merely a customer deposit.

---

[6] Since mileage driven would not have been ascertainable by
the Dealerships, the most likely method of reporting income
consistent with the deposit theory would have been simply to
prorate the amount of the deposit over the maximum period of
coverage provided under the contract in accordance with the
refund schedule.  Cf. Highland Farms, Inc. v. Commissioner, 106
T.C. 237 (1996).

Even if petitioners' deposit theory were consistent with the accounting method that they are defending, their reliance upon Indianapolis Power & Light would be misplaced.  Not all refundable payments can be excluded from income.  There is a large body of case law to the contrary.  See, e.g., Brown v. Helvering, 291 U.S. 193 (1934) (insurance commissions repayable in the event of policy cancellation); United States v. Wiese, 750 F.2d 674, 677 (8th Cir. 1984) (refundable payments received under installment sales contract prior to delivery of merchandise); Union Mut. Life Ins. Co. v. United States, 570 F.2d at 386 n.2 (prepaid interest refundable in the event of premature loan repayment); Ertegun v. Commissioner, 531 F.2d 1156 (2d Cir. 1976), affg. T.C. Memo. 1975-27 (receipts from record sales under contract entitling purchaser to return for credit refund); S. Garber, Inc. v. Commissioner, 51 T.C. 733 (1969) (refundable advance payments for custom-made clothing); Moritz v. Commissioner, 21 T.C. 622 (1954) (refundable advance payments for photographs); South Tacoma Motor Co. v. Commissioner, 3 T.C. 411 (1944) (purchase price of books of coupons redeemable in exchange for automobile maintenance services, where buyer entitled to return unused coupons for pro rata refund); Colonial Wholesale Beverage Corp. v. Commissioner, T.C. Memo. 1988-405, affd. 878 F.2d 23 (1st Cir. 1989) (refundable container deposits on beverage sales); Handy Andy T.V. & Appliances, Inc. v.

Commissioner, T.C. Memo. 1983-713 (refundable purchase price of multiyear television service policy contract); J.J. Little & Ives Co. v. Commissioner, T.C. Memo. 1966-68 (receipts from magazine sales under contracts entitling purchaser to return for credit refund); Smith v. Commissioner, T.C. Memo. 1962-128, affd. 324 F.2d 725 (9th Cir. 1963) (gain from sale of restaurants where buyer entitled to return assets under certain circumstances).

On the other hand, there are numerous precedents upholding the taxpayer's characterization of a refundable payment as a deposit in the absence of a binding agreement to apply the sum to the purchase of specific goods and services. Consolidated-Hammer Dry Plate & Film Co. v. Commissioner, 317 F.2d 829 (7th Cir. 1963), affg. in part and revg. in part T.C. Memo. 1962-97 (progress payments made under construction contract prior to final determination of work specifications and amount due for work); Clinton Hotel Realty Corp. v. Commissioner, 128 F.2d 968, 969, 970 (5th Cir. 1942), revg. 44 B.T.A. 1215 (1941) (lease security deposits, where "If the only agreement was that it should apply to the last year's rent, it would of course be rent paid in advance", but "there were many things to which it might become applicable besides the * * * [last year's] rent."); Veenstra & DeHaan Coal Co. v. Commissioner, 11 T.C. 964 (1948) (customer advances used to buy inventory prior to formation of definite sale contract).

Indianapolis Power & Light did not purport to overrule these authorities and establish refundability as the exclusive criterion for distinguishing taxable sales income from nontaxable deposits in all cases. Continental Ill. Corp. v. Commissioner, 998 F.2d 513 (7th Cir. 1993), affg. on this issue T.C. Memo. 1989-636. What distinguished the nontaxable deposits in the Indianapolis Power & Light line of cases from taxable income was not their refundability per se; ultimately the classification of these amounts as nontaxable deposits turned on the fact that the taxpayer's right to retain them was contingent upon the customer's future decisions to purchase services and have the deposits applied to the bill. Commissioner v. Indianapolis Power & Light, 493 U.S. at 210-212; Oak Indus., Inc. v. Commissioner, 96 T.C. at 571-572, 574-575; Buchner v. Commissioner, T.C. Memo. 1990-417. The payments at issue in the cases at hand do not share this characteristic.

To see why this is true, assume that a Dealership sells 500 VSC's, all contract holders elect to receive coverage until their contracts expire, and they file claims with the Dealership for covered repairs that fully consume the reserves in the Dealership's PLRF account. On these facts, all amounts deposited into the account will be recovered by the Dealership. Now assume that the facts are the same except that no claims are filed. Upon expiration of the contracts, all amounts deposited into the

account become available for release to the Dealership.  Thus, in both scenarios the Dealership recovers all the reserve deposits, yet only in the first were any amounts applied to payment for repair services.  Finally, assume that in the first week of coverage due to expire after 5 years or 60,000 miles, one contract holder files a claim for covered repairs that consumes the entire amount of the reserves attributable to his contract.  Then, at the end of the first year when he has driven 30,000 miles, he cancels.  The contract holder is entitled to a refund of one-half of the purchase price of the VSC, even though the entire amount of the reserves attributable to his contract has already been applied to his claim for repair services.  As these examples demonstrate, the Dealership's right to recover amounts deposited in the reserve is not contingent upon the contract holders' actual future claims for repair services.  Rather, it is contingent upon time elapsed and mileage driven while the contract remains in force, variables that are entirely independent of the amounts applied to repair services.

The absence of any relationship between the amounts of the reserves actually applied to the provision of repairs under the VSC and the determination of how the reserves are earned for refund purposes highlights the central error in petitioners' theory.  This absence indicates that the contract price is in fact paid for a service that is measured in terms of time and

mileage, not parts and labor.  In short, the contract price is
consideration for the present sale of a warranty, not a deposit
to be held pending future agreements to provide repairs.

There is a straightforward explanation for the refundability
of the contract holder's payment that does not require us to
obliterate the well-settled distinction between deposits and
sales income and to extend the holding of Indianapolis Power &
Light beyond all recognition:  the price of the VSC is subject to
pro rata refund upon cancellation because it is similar to a
premium paid under a standard insurance policy.  Since the VSC
serves the function of insuring the vehicle purchaser against
loss, it is not surprising that it is sold on terms similar to
other types of insurance.[7]

c.  Petitioners' Trust Fund Theory

According to the second theory advanced by petitioners, a
Dealership did not realize income from the sale of a VSC to the

---

[7] This Court has previously noted the similarity between an
extended service contract for consumer durables and a contract of
insurance.  See Standard Television Tube Corp. v. Commissioner,
64 T.C. 238, 243 (1975).  To say that the VSC resembles insurance
from the contract holder's perspective is not to say that it
constitutes insurance from the Dealership's perspective.
According to a view espoused by the Commissioner, the Dealership
bears an insurance risk only to the extent that it agrees to
indemnify the contract holder for repairs performed by other
facilities; to the extent that it may perform covered repairs
itself, the risk it bears is more properly regarded as a business
risk.  On this distinction, see Rev. Rul. 68-27, 1968-1 C.B. 315;
see also Jordan v. Group Health Association, 107 F.2d 239, 248
(D.C. Cir. 1939).

extent of the portion of the contract price deposited in escrow, because this amount constituted a trust fund for the benefit of the purchaser.  Petitioners argue that the Dealership acted as a mere conduit in collecting these funds and transferring them to the Escrow Trustees, that the purchasers owned the funds held in the PLRF, and that the Dealership first acquired property rights in the reserve funds when the funds were disbursed to it by the Trustees.  Petitioners find support for this theory chiefly in Angelus Funeral Home v. Commissioner, 47 T.C. 391 (1967), affd. on other grounds 407 F.2d 210 (9th Cir. 1969), and Miele v. Commissioner, 72 T.C. 284 (1979).  Petitioners contend that "It would be impossible to find for Respondent on this issue without expressly overruling this Court's previous opinion in Angelus Funeral Home," and "The situation presented in Miele is virtually indistinguishable from that presented here."

In Angelus Funeral Home the taxpayer was an accrual basis funeral home that collected payments from its customers under "pre-need funeral plan agreements" obligating it to perform, or have performed, certain funeral services for the customer upon his death.  The agreements provided that the customer's payment be segregated in a special account, be held "in irrevocable trust for the uses and purposes herein set forth", and be fully expended for such purposes.  The funeral home reported the amounts so collected as income for the year in which the funeral

services were provided. In upholding the taxpayer's exclusion of the payments from gross income for the year of receipt, we reasoned that the preneed funeral contract "created a custodial or trust arrangement" for the benefit of the customer, that the taxpayer received the payments as a custodian or trustee, and that, accordingly, it did not realize income from sale of the preneed contracts.

The issue in Miele was how a law firm should account for prepaid legal fees. The taxpayer, a cash basis law firm, was required under the State professional responsibility code to preserve the identity of advances received from clients by segregation of the funds in a client trust account and by separate accounting for each client. When a case was closed, the firm transferred the earned portion of the client's advances to its own general account and refunded the unearned portion to the client. It reported the advances as income only when transferred to its general account. In consideration of the legal restrictions on the law firm's use of the advances, we held that the advances were properly treated as belonging to the client until transferred to the firm's general account, and hence the law firm was "not in receipt of income when the payments were actually received." Miele v. Commissioner, supra at 290.

Respondent would distinguish Angelus Funeral Home and Miele on the ground that they concerned whether the taxpayer actually

or constructively received the amounts it was obligated to hold in trust for the customer. In the cases at hand, respondent argues, we need not inquire into the effect of contractual restrictions upon the taxpayer's use of funds collected from customers, because even if the taxpayer's use of the funds was sufficiently restricted that collection did not constitute receipt of income, the taxpayer acquired a fixed right to receive the funds when it collected them and, hence, must include them in income at that time.

Respondent's contentions do not dispose of petitioners' argument. Under the right-to-receive analysis of the Hansen line of cases, which we have applied by analogy to the cases at hand, it is clear that the amount withheld to secure the taxpayer's obligations is income to the taxpayer; the question is only when it must be accrued. By contrast, the question in Angelus Funeral Home and Miele was whether the taxpayer received the amounts at issue as income or as the property of another. Angelus Funeral Home v. Commissioner, supra at 395, 407 F.2d at 212; Miele v. Commissioner, supra at 289. A taxpayer cannot receive, or have the right to receive, funds as income before it acquires a beneficial interest in the funds. See Healy v. Commissioner, 345 U.S. 278, 282 (1953); Metairie Cemetery Association v. United States, 282 F.2d 225, 230 (5th Cir. 1960); Portland Cremation Association v. Commissioner, 31 F.2d 843, 845-846 (9th Cir.

1929), revg. 10 B.T.A. 65 (1928); <u>Ford Dealers Adver. Fund, Inc.</u>
<u>v. Commissioner</u>, 55 T.C. 761, 770-774 (1971), affd. 456 F.2d 255
(5th Cir. 1972); <u>Artnell Co. v. Commissioner</u>, 48 T.C. 411, 417-
418 (1967), revd. on other grounds 400 F.2d 981 (7th Cir. 1968);
<u>Seven-Up Co. v. Commissioner</u>, 14 T.C. 965, 977-978 (1950); <u>Twin</u>
<u>Hills Meml. Park & Mausoleum Corp. v. Commissioner</u>, T.C. Memo.
1954-206.  If and to the extent that the contract holder retains
the beneficial interest in the funds collected by the Dealership,
the Dealership is not required to include them in gross income.[8]

It is therefore necessary to address petitioners' contention
that the contract holder does not relinquish beneficial ownership
of the portion of the contract price allocable to the PLRF.  In
other words, we must decide whether the VSC arrangement, like the
preneed funeral arrangement in <u>Angelus Funeral Home</u> and the
arrangement for prepaid legal fees in <u>Miele</u>, provided for
collection of this money in trust for the contract holder's
benefit.

---

[8] Respondent tries to distinguish the cases on which
petitioners rely by further pointing out that in <u>Miele v.</u>
<u>Commissioner</u>, 72 T.C. 284 (1979), the funds in the client trust
account belonged to the client and that in <u>Angelus Funeral Home</u>
<u>v. Commissioner</u>, 47 T.C. 391 (1967), affd. on other grounds 407
F.2d 210 (9th Cir. 1969), the preneed funeral arrangement created
a grantor trust on behalf of the customer.  But respondent's
observations simply beg the question whether the contract holders
in the cases at hand also retain a beneficial interest in the
reserves.

Section 301.7701-4(a), Proced. & Admin. Regs., provides that, in general, the term "trust", as used in the Internal Revenue Code, refers to an arrangement created by will or by inter vivos declaration whereby a trustee takes title to property for the purpose of protecting or conserving it for beneficial owners under the ordinary rules applied in chancery or probate courts.  Under the case law, for Federal income tax purposes a relationship generally is classified as a trust if it is "clothed with the characteristics of a trust"--a standard that tends to be more inclusive than a technical trust under State law.  United States v. De Bonchamps, 278 F.2d 127, 133 (9th Cir. 1960); Hart v. Commissioner, 54 F.2d 848, 850-851 (1st Cir. 1932), revg. in part 21 B.T.A. 1001 (1930); Weil v. United States, 148 Ct. Cl. 681, 180 F. Supp. 407, 411 (1960).  No particular words are necessary to create an express trust; its existence may be inferred from the pertinent facts and circumstances.  Portland Cremation Association v. Commissioner, supra at 846; Broadcast Measurement Bureau, Inc. v. Commissioner, 16 T.C. 988, 997 (1951).

For State law purposes, an express private trust arises where a trustee acquires legal title to specific property (the trust property or res) subject to enforceable equitable rights in a beneficiary.  1 Restatement, Trusts 2d, sec. 2 (1959); Bogert, The Law of Trusts and Trustees, sec. 1, at 1-2 (2d ed. 1984).

The trust res must be sufficiently described or capable of identification that its title can pass to the trustee upon actual delivery of the trust corpus. In re Schnitz, 52 Bankr. 951, 955 (W.D. Mo. 1985); Newton v. Wimsatt, 791 S.W. 2d 823, 827 (Mo. Ct. App. 1990); cf. 1 Restatement, supra sec. 76; Bogert, supra sec. 113, at 323-329. Thus, only the person who has title or interest in property can make it the subject matter of a trust. Buhl v. Kavanagh, 118 F.2d 315, 320 (6th Cir. 1941); Brainard v. Commissioner, 91 F.2d 880, 881 (7th Cir. 1937), affg. 32 B.T.A. 1036 (1935).

We begin by determining whether the PLRF constituted a trust fund. The PLRF was established for the purpose of protecting and conserving funds for the satisfaction of the Dealerships' obligations to purchasers under the VSC's. The Escrow Trustees held title to the PLRF accounts in their own names as trustees. The property to which they took title was distinctly identified in the Administrator Agreement as comprising all amounts deposited by a Dealership plus the accumulated investment income. PLRF assets could inure to the benefit of a Trustee only to the extent that: (1) They were not used to pay claims or refunds prior to the expiration of the contracts to which they were attributable; (2) they were not needed to maintain the Dealership's account balance at an actuarially safe level; and (3) they were not otherwise payable to the Dealership or its

successor.  Under the escrow arrangement there was accordingly a separation of legal and beneficial ownership with respect to specific property that was inconsistent with a mere bailment. See Bogert, supra sec. 11, at 122-123.  The Escrow Trustees exercised some discretion over the investment of the reserves and the release of unconsumed reserves; through their audit authority, they also supervised the Dealerships' compliance with the terms of the VSC program.  Neither the Dealerships nor the contract holders had access to the reserves or the right to control the actions of the Escrow Trustees.  The escrow arrangement was therefore not an agency relationship.  See generally 1 Restatement, supra sec. 8; Bogert, supra sec. 15, at 163, 168-169, 172-176.  Cf. McCrory v. Commissioner, 69 F.2d 688, 689 (5th Cir. 1934), affg. 25 B.T.A. 994 (1932).  We are satisfied that the PLRF accounts would qualify as trusts under general principles of law as well as the law of the particular States governing the operative agreements.  Cf. Merchants Natl. Bank v. Frazier, 67 N.E.2d 611 (Ill. App. Ct. 1946) (escrow treated as express trust); Newton v. Wimsatt, supra; Southern Cross Lumber & Millwork Co. v. Becker, 761 S.W.2d 269 (Mo. App. Ct. 1988) (same).  The PLRF accounts are also properly regarded as trusts for Federal income tax purposes.

It does not follow that funds deposited into the PLRF accounts by the Dealerships were collected from the individual

purchasers in trust, or that these funds were held in the PLRF accounts for the purchasers' benefit. In support of their theory, petitioners point to the language of the operative agreements. The Administrator Agreement provides that "To the extent that Dealer receives monies for Reserves, Administrator's fees or insurance premiums, Dealer agrees to accept and hold such monies as a fiduciary in trust". It further provides:

> All Reserves in the Escrow Account(s) shall be held for the primary benefit of Contract holders to secure Dealer's performance under the Contracts and to pay for valid claims arising under the Contracts. Dealer shall have no beneficial or other property interest in the Reserves or investment income in the Escrow Accounts(s) * * *.

The Escrow Agreement between the Escrow Trustees and the bank acting as escrow depository likewise recites that "the vehicle service contract entered into between a dealer in the Dealer Group and a consumer requires that a Primary Loss Reserve Fund escrow account be established for the benefit of the consumer."

The language that contracting parties use to describe the effect of their agreements may accurately reflect their intentions, but it may also inadvertently or deliberately misrepresent them. In determining whether the operative agreements create rights and obligations characteristic of a trust, we do not regard the language quoted above as controlling. See Davis v. Aetna Acceptance Co., 293 U.S. 328, 333-334 (1934); In re Schnitz, supra at 955-956. Petitioners themselves do not

take all the language quoted above at face value.  On brief they take the position that, unlike the portion of the VSC contract price allocable to the PLRF, the portions of the contract price allocable to Fees and Premium "were not received by the issuing Dealership in trust," notwithstanding the express language in the Administrator Agreement to the contrary.  They offer no explanation for this apparent inconsistency.  If we look beyond the language to the function and actual effect of the agreements as well as to the conduct of the parties, we find no support for petitioners' interpretation.

    (1)  <u>The Reserves Could Not Have Been Collected From the Purchaser in Trust Under the VSC, Because the Rights of the Purchaser Under the VSC Did Not Relate to Any Specific Trust Property</u>

A trust is a relationship in which rights are created with respect to the specific property transferred by the settlor to the trustee.  Thus, under the preneed funeral arrangement in <u>Angelus Funeral Home v. Commissioner</u>, 47 T.C. 391 (1967), and the arrangement for prepaid legal fees in <u>Miele v. Commissioner</u>, 72 T.C. 284 (1979), each of the taxpayer's customers acquired exclusive rights in a trust fund corresponding to the amount he paid to the taxpayer.  Even though, for reasons of administrative convenience, each customer's payment was not physically segregated, it was credited to a separate account and entitled the customer to have an equivalent amount of assets in the trust fund used exclusively for his benefit.  The individual payment

became the subject of a trust because its identity as specific property of the customer was preserved in the form of a fixed claim to a corresponding portion of a segregated fund.

By contrast, the VSC creates no rights for the purchaser that are defined by reference to the portion of the contract price deposited in the PLRF. The amount of this deposit is determined by reference to the cost that the Dealership expects to incur in satisfying its warranty obligations to the purchaser. But plainly the purchaser is not entitled to have the Dealership incur this cost in all events. Nor does the VSC or any other operative agreement require the Dealership to maintain a separate account for each contract holder to preserve a fixed portion of the reserves for his exclusive benefit. The amount of any contract holder's claims that may be satisfied from the reserves is at all times indefinite. The deposit attributable to each contract holder makes possible the payment not only of his own claims, but also those of other contract holders. Conversely, the amount of reserves available for use on behalf of each contract holder is as large or small as the pool, up to the specified coverage ceiling. The pooled aggregate of all deposits plus accumulated income is the only identifiable trust res, and no individual contract holder is capable of transferring title to the pool.

There are compelling economic reasons for structuring the VSC arrangement differently from the preneed funeral arrangement. The purpose of the VSC arrangement, from the contract holder's perspective, is to insure a risk. Pooling serves the function of distributing that risk among all the Dealership's contract holders. Risk distribution is useful because it reduces the deviation of actual losses from expected losses as a percentage of both the expected losses and the resources in the pool. See Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61, 66, 101, modified 96 T.C. 671 (1991), affd. in part and revd. in part 972 F.2d 858 (7th Cir. 1992). This reduction in "relative risk" achieved through pooling enables the Dealership and Travelers to charge less for assuming the contract holder's risk. Using a structure similar to the preneed funeral arrangement would preclude risk distribution and cost the contract holder much more without providing him any greater security.[9]

The refund provision under the VSC is also probative evidence that petitioners' theory mischaracterizes the relationship among the parties. The amount of the Dealership's

---

[9] It is important to distinguish two senses of the word "pooling". Risk distribution ("pooling" in the insurance sense) does not occur simply by holding money received from different customers in a combined trust account, where each customer retains exclusive rights to a specific portion of the combined fund ("pooling" of the sort that appears to have occurred in Angelus Funeral Home and Miele).

refund obligation is determined by a formula based on the full contract price, time elapsed, and mileage driven. The refund is unaffected by the amount of claims for repairs under the contract that have been financed from the PLRF. Yet if the VSC created a specific trust property to finance each contract holder's repairs, the consumption of that property through repairs would reduce the refundable balance pro tanto, in the same manner that the rendition of attorneys' services reduced the refundable balance of the client trust account in <u>Miele</u>. The actual operation of the VSC arrangement demonstrates that the funds collected by the Dealership on the sale of a VSC were not impressed with a trust in favor of the contract holder.

     (2)  <u>The Purchaser Had No Beneficial Interest in the PLRF;<br>the PLRF Existed for the Benefit of the Individual<br>Dealerships and for the Protection of Travelers</u>

The operative agreements do not grant the purchaser any rights that the status of beneficiary would imply. None of the agreements expressly recognizes any right of the purchaser to enforce the terms for the establishment, funding, administration, or termination of the trust. On the contrary, the VSC expressly disclaims any liability of the Administrator to the purchaser. The obligations of the Escrow Trustees ordinarily do not run to the purchaser directly. Reserves are released to the issuing Dealership or to another authorized repair facility. Even cancellation refunds are remitted to the issuing Dealership for

forwarding to the purchaser.  There is no reporting obligation to the purchaser concerning the status of the PLRF account.  In the event of the Dealership's default, the purchaser cannot look to the PLRF for satisfaction of the Dealership's obligation.  His recourse is to file a claim with Travelers.  It is the insurance company which, after paying the purchaser's claim, is entitled to recover its loss out of the Dealership's PLRF account.  The accounts are titled in the name of the Escrow Trustees "for the Dealer Group" or for each Dealership separately, and the Dealerships are designated as the FDIC insured depositors.  These provisions refute the proposition that the contract holders were intended to hold a beneficial interest in the trust.

Furthermore, we are unable to see any functional rationale for petitioners' theory of beneficial ownership.  The accumulation and conservation of the trust fund was clearly a matter of concern to the Dealerships.  As long as they fulfilled certain minimal conditions, they were entitled to recover at least the principal portion (if not also the income portion) of any unconsumed reserves.  They were personally liable for any losses in excess of the reserves and would have to pay for these losses out of their own pockets if they failed to maintain excess loss insurance or properly file claims under the insurance policies.  One of the primary purposes of the PLRF arrangement was to provide the Dealership with greater security than the

structure of the NADS program had afforded.  As excess loss insurer, Travelers also had a vital interest in the size and security of the trust fund.  The PLRF accounts served as Travelers' buffer.  Release of reserves under any circumstances (claims for repairs, cancellation refunds, unconsumed reserves) reduced the account balances and increased the insurance company's exposure.

The contract holder would have been largely indifferent to the status of the trust fund.  Under the VSC the contract holder was entitled to have his losses covered up to the maximum amount specified in the contract from the PLRF, the Dealership's own funds, or Travelers.  If the Dealership failed to satisfy a covered claim or refund the unearned portion of the contract price upon cancellation, the contract holder had recourse against Travelers.  With "one of the six largest property and casualty insurance companies in the United States" providing ultimate assurance to the contract holder that his interests would be protected, a beneficial interest in the PLRF would have been essentially superfluous to him.

If the Dealerships had understood the VSC program to protect the contract holders by granting them a beneficial interest in the trust fund, one would expect them to have called attention to this aspect of the program when they recommended it to their customers.  It generally appears that the Dealerships did not

mention the PLRF in their sales presentations to prospective VSC purchasers.  The protection that the Dealerships did emphasize was the major insurance company that was underwriting the program, symbolized by the red Travelers umbrella that the manager of one of the Dealerships testified that he kept on hand for this purpose.

We conclude that VSC purchasers held no beneficial interest in the PLRF.  Recognition of the PLRF as a trust for Federal income tax purposes provides no basis for the exclusion of reserve deposits from the Dealerships' gross income.

2.    Investment Income of the PLRF

Investment income earned by the PLRF apparently was not reported on any tax return for taxable years prior to 1992.  For 1992 and subsequent years, the Escrow Trustees filed Forms 1041 for each escrow account, ostensibly reporting this income in a manner consistent with the treatment of the accounts as complex trusts.  Petitioners advance alternative arguments defending both treatments:

> Code §468B(g), which was enacted in 1986, directed Respondent to issue regulations which would specify how investment income such as that credited to the Escrow Accounts should be taxed. * * *  The regulations which were finally issued do not address situations such as the one presented here.  [Fn. ref. omitted.]
>
> In the absence of regulatory guidance, the Court should apply the law as it existed before enactment of Code §468B(g).  The principles developed by the courts would defer taxation of any earnings credited to the Escrow Accounts until their owner is identified.

Under the "homeless income" doctrine, these amounts are not currently reportable by anyone until subsequent events determine who will ultimately receive them.

Since the funds held in the Escrow Accounts did not belong to the issuing Dealerships, the interest which accrued on the accounts is not chargeable to them either.

If the Court determines that it must develop its own rules to implement Code §468B(g), it should treat the Escrow Accounts as separate taxable entities (presumably trusts). Under either alternative, no investment income can be currently charged to the Dealerships.

Prior to 1986 a number of cases and rulings suggested that the earnings of a litigation settlement fund, receivership, or escrow account that did not qualify as a trust for Federal income tax purposes were not taxable until the identity of the person entitled to receive the income could be determined. See, e.g., North Am. Oil Consol. v. Burnet, 286 U.S. 417 (1932); Rev. Rul. 71-119, 1971-1 C.B. 163; Rev. Rul. 70-567, 1970-2 C.B. 133; Rev. Rul. 64-131, 1964-1 C.B. (Part 1) 485. Section 468B was enacted as part of the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1807(a)(7), 100 Stat. 2814, to clarify the tax consequences of certain settlement funds established pursuant to a court order for payment of tort liabilities ("designated settlement fund"). Sec. 468B(a), (b), (d)(2). The statute provides that a designated settlement fund is a separate taxable entity subject to current taxation on its net income at the maximum fiduciary rate. Sec. 468B(b). A provision relating to the taxation of

escrow accounts, settlement funds, and similar funds generally was incorporated in the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 1018(f)(5)(A), 102 Stat. 3582, and was codified as section 468B(g).  Section 468B(g) provides:

> SEC. 468B(g).  Clarification of Taxation of Certain Funds.--Nothing in any provision of law shall be construed as providing that an escrow account, settlement fund, or similar fund is not subject to current income tax.  The Secretary shall prescribe regulations providing for the taxation of any such account or fund whether as a grantor trust or otherwise.

The section applies to escrow accounts, settlement funds, or similar funds established after August 16, 1986.  H. Rept. 100-795, at 377 (1988); S. Rept. 100-445, at 398 (1988).

The committee reports contain the following guidance concerning the regulations authorized by the statute:

> It is anticipated that these regulations will provide that if an amount is transferred to an account or fund pursuant to an arrangement that constitutes a trust, then the income earned by the amount transferred will be currently taxed under Subchapter J of the Code. Thus, for example, if the transferor retains a reversionary interest in any portion of the trust that exceeds 5 percent of the value of that portion, or the income of the trust may be paid to the transferor, or may be used to discharge a legal obligation of the transferor, then the income is currently taxable to the transferor under the grantor trust rules.

Id.

Final regulations under section 468B(g) were issued in December 1992.  Sec. 1.468B-1, Income Tax Regs.  The scope of the

regulations is limited to certain types of litigation settlement funds.  Funds that satisfy obligations "to repair or replace, products regularly sold in the ordinary course of the transferor's trade or business" are specifically excluded from coverage.  Sec. 1.468B-1(g)(2), Income Tax Regs.

The rules governing the taxation of grantor trusts are contained in subpart E of subchapter J, sections 671-679.  Section 671 provides that when the grantor is treated as the owner of any portion of a trust, the grantor's taxable income and credits are computed taking into account those items of the trust's income, deductions, and credits attributable to the portion of the trust that the grantor is treated as owning.  Section 677(a) provides that the grantor is treated as the owner of any portion of a trust whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be:  (1) Distributed to the grantor, or (2) held or accumulated for future distribution to the grantor.  The regulations provide the following interpretive gloss on the scope of the statutory language:

> Under Section 677 the grantor is treated as the owner of a portion of a trust if he has retained any interest <u>which might, without the approval or consent of an adverse party, enable him to have the income from that portion distributed to him at some time</u> either actually or constructively * * *.  [Sec. 1.677(a)-1(c), Income Tax Regs.; emphasis added.]

Use of the income of the trust for the purpose of discharging a legal obligation of the grantor constitutes a distribution to the grantor within the meaning of section 677(a). Anesthesia Serv. Med. Group, Inc. v. Commissioner, 85 T.C. 1031, 1055 (1985), affd. on other grounds 825 F.2d 241 (9th Cir. 1987); sec. 1.677(a)-1(d), Income Tax Regs.

Section 672(a) defines an "adverse party" as any person having a substantial beneficial interest in a trust that would be adversely affected by the exercise or nonexercise of a power that the party possesses respecting the trust. Section 672(b) defines "nonadverse party" as any person who is not an adverse party.

The legislative history of the Internal Revenue Code of 1954 explains that section 677 contemplates situations in which payment of trust income to or for the benefit of the grantor is either required under the terms of the trust or discretionary. H. Rept. 1337, 83d Cong., 2d Sess. A217 (1954). The classification of persons that participate in the administration of the trust as adverse or nonadverse parties becomes relevant to the application of section 677 only if such persons exercise discretion. The theory behind this distinction is that where a power to pay trust income to the grantor or for his benefit is held by some person other than the grantor, the power should nevertheless be attributed to the grantor if the holder of the power has no substantial beneficial interest that would be

adversely affected by exercise of the power for the grantor's benefit. The presumption is that there is a sufficient likelihood that the holder will exercise his power for the benefit of the grantor unless it would be detrimental to his own interests to do so. Id. at A212; 3 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 80.1.3, at 80-13 (2d ed. 1991).

We do not agree with petitioners that the investment income earned by the PLRF is "homeless income" whose taxation must be deferred until its ultimate disposition is determined. At the inception of the PLRF its owners were identifiable under the grantor trust rules.

In the previous section of this Opinion, we concluded that the PLRF is classified as a trust for Federal income tax purposes. The Dealerships were the grantors of the trust because it was they who supplied the trust property. As explained in the previous section, unlike the preneed funeral arrangement under which the funeral home acted as a mere conduit in transferring trust property from its customers, the money collected from VSC purchasers did not constitute identifiable trust property before it left the hands of the Dealerships. Cf. Buhl v. Kavanagh, 118 F.2d at 319; Smith v. Commissioner, 56 T.C. 263, 289-291 (1971). Pursuant to the Administrator Agreement, the PLRF was established to fund the Dealerships' obligations under the VSC's. All income

earned by the PLRF was available for use to discharge the Dealerships' obligations either currently or in future, as needed. It follows that the Dealerships are treated as owners of the entire trust, provided that the application of trust income for the Dealerships' benefit in this manner did not depend upon the approval or consent of an adverse party. Sec. 1.677(a)-1(c) and (d), Income Tax Regs.

The Administrator Agreement requires the authorization of both Escrow Trustees (the Managing Agent and Administrator) for release of any reserves from the PLRF. Since the Administrator is entitled to receive any investment income of the PLRF not paid to or used for the benefit of the Dealerships, the Administrator plainly holds an interest in the PLRF that is adversely affected by the release of income to or for the benefit of the Dealerships. However, the authorization contemplated by the Administrator Agreement is not the exercise of a "power" within the meaning of section 672(a). A power for purposes of subpart E of subchapter J means a discretionary right to control the beneficial enjoyment of trust income, and it is relevant to the question of the grantor's ownership of the trust only to the extent that it can be exercised out of self-interest at the grantor's expense. See H. Rept. 1337, supra at A212, A217; sec. 1.677(a)-1(e), Income Tax Regs.

The Administrator possesses no such discretion over the payment of claims. Under the trust arrangement, the Escrow Trustees are obligated to release reserves upon receipt of any claim meeting specified conditions. As fiduciaries, they are required by law to administer the PLRF in accordance with its stated purpose to fund the Dealerships' obligations under the VSC's. The Administrator's own rights to trust income are similarly fixed by the terms of the trust. The Administrator has no power to withhold consent to a payment from the PLRF for a Dealership's benefit in order to appropriate those funds for its own benefit. The authorization requirement must therefore be intended only to ensure orderly administration of the trust. To the extent that the Administrator Agreement does confer discretionary authority upon the Administrator, it is not authority to determine the use of trust assets but an authority limited to procedural matters incidental to the use of trust assets to satisfy the Dealerships' obligations.

In spite of having an interest adverse to the use of trust income for the Dealerships' benefit, the Administrator is not an adverse party. Cf. In re Sonner, 53 Bankr. 859, 61 AFTR 2d 88-755, 85-2 USTC par. 9810 (Bankr. E.D. Va. 1985). Accordingly, pursuant to sections 671 and 677(a), the Dealerships are each treated as owning an allocable portion of the PLRF and must

include the income attributable to their respective portions as if earned by them directly. Sec. 1.671-2(c), Income Tax Regs.

Section 468B(g) does not warrant a different result. The statute and regulations issued thereunder do not prescribe rules for identifying the person currently taxable on the income earned by the PLRF. However, the statute plainly requires that this income be taxed currently and does not purport to override any existing rules that may apply to tax the income of the PLRF currently. Nor does the statute purport to suspend the application of such rules pending issuance of implementing regulations. The TAMRA committee reports contemplate that if an escrow arrangement creates a trust relationship, the rules of subchapter J will control. See supra p. 57. Taxation of the PLRF as a grantor trust is therefore consistent with the statutory mandate and the intention of Congress.

3. Administrator's Fees and Insurance Premiums

The Dealerships' Federal income tax returns for the years at issue do not reflect the portions of the VSC purchase price that the Dealerships promptly remitted to the Administrator in payment of the Administrator's Fees and excess loss insurance premiums. Petitioners' defense of this treatment rests squarely on the matching principle: "The clear reflection of the Dealership's net income requires that the recognition of income and related expenses attributable to these two items occur concurrently."

While petitioners consistently maintain that these receipts and expenses should have no _net_ effect on the Dealerships' taxable income, they advance alternative arguments concerning when the individual items should be taken into account. Prior to trial they took the position, inter alia, that the expenses were currently deductible. On brief they contend that both Premiums and Fees are "period expenses" that should be capitalized and amortized over the VSC term, and that the portions of the contract price corresponding to these expenses should accordingly be included in gross income ratably over the contract term as well.

Respondent determined that the Dealerships' method of accounting for these expenses and the corresponding receipts improperly accelerated deductions or deferred income, resulting in a distortion of the Dealerships' income.[10] We agree. However, we conclude that some of these deductions may be taken earlier than respondent has allowed.

a. <u>Timing of Deductions</u>

Under the accrual method of accounting, a liability is incurred and generally taken into account for the taxable year in which all events have occurred that establish the fact of the

---

[10] Respondent does not challenge the Dealerships' treatment of the Commissions that they paid out of VSC sale proceeds. Respondent concedes that the Commissions were a currently deductible expense.

liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability. Secs. 1.446-1(c)(1)(ii)(A), 1.461-1(a)(2), Income Tax Regs. The time when economic performance occurs is determined in accordance with section 461(h) and the regulations thereunder. These rules provide generally that: (1) Where the liability requires the taxpayer to provide services or property, economic performance occurs as the taxpayer incurs costs in connection with satisfaction of the liability, sec. 461(h)(2)(B); sec. 1.461-4(d)(4)(i), Income Tax Regs.; (2) where the liability arises out of the provision of services or property to the taxpayer by another person, economic performance occurs as the services or property is provided by that person, sec. 461(h)(2)(A)(i); sec. 1.461-4(d)(2)(i), Income Tax Regs.; (3) where the liability arises out of the provision of insurance to the taxpayer, economic performance occurs when payment is made to the insurer, sec. 1.461-4(g)(5), Income Tax Regs.

Section 1.461-1(a)(2), Income Tax Regs., clarifies that a liability that relates to the creation of an asset having a useful life extending substantially beyond the close of the taxable year in which the liability is incurred is taken into account through capitalization, and may affect the computation of taxable income in later years through appropriate cost recovery deductions. See sec. 263; Commissioner v. Lincoln Sav. & Loan

Association, 403 U.S. 345 (1971).  Lump-sum payments for multiyear insurance coverage generally are capital expenditures that may be recovered only through amortization over the period of coverage.  Commissioner v. Boylston Market Association, 131 F.2d 966 (1st Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals; Higginbotham-Bailey-Logan Co. v. Commissioner, 8 B.T.A. 566, 577 (1927); secs. 1.461-4(g)(8), Example (6), 1.167(a)-3, Income Tax Regs.

The VSC's required the Dealerships to obtain excess loss insurance coverage for periods of 1 to 7 years.  The Dealerships incurred the liability for this insurance in the year the Premium was paid.  However, to the extent that part of any Premium was allocable to coverage for subsequent years, it must be capitalized and amortized by deductions in those years.

The Administrator's Fees are subject to different treatment. The VSC required the Dealerships to establish the PLRF to fund their repair obligations.  Economic performance with respect to this liability occurred as the Dealerships incurred costs in connection with the establishment and administration of the PLRF. Sec. 1.461-4(d)(4), Income Tax Regs.  The Dealerships incurred these costs as the Administrator actually rendered services to them.  Sec. 1.461-4(d)(2), Income Tax Regs.; see sec. 1.461-4(d)(7), Example (1) (performance of reclamation services through independent contractor), Example (2) (performance of services

under multiyear warranty requiring procurement of replacement parts), Examples (4) and (5), Income Tax Regs.  Since no portion of the Fees is incurred for a taxable year preceding the year in which the corresponding service benefits are provided, the Fees do not constitute capital expenditures like the Premiums that are recovered through amortization.  The result under section 461(h) marks a departure from the law in effect prior to its enactment as part of the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 91(a), 98 Stat. 494, 598.  See, e.g., Seligman v. Commissioner, 84 T.C. 191 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Thielking v. Commissioner, T.C. Memo. 1987-201, affd. without published opinion 860 F.2d 1084 (8th Cir. 1988) (both holding under prior law that amounts paid at the inception of equipment leases for lease administration and management services were capital expenditures that must be amortized over the lease term).

While the rule for identifying when prepaid service expenses are incurred is clear, its application to the facts of these cases is problematic.  If it were known at the inception of the contract that, for example, X percent of the services would be provided in the first year and the remaining (100-X) percent in the final year, then the rule would be applied by recognizing proportional amounts of the expense for the first and final years.  If it were not known at the inception of the contract

when the services would be performed, but they could only be performed within the same year, then the rule would be applied by recognizing the entire cost for the year in which services were performed. Here however, the services consist to a substantial extent in the processing of breakdown claims and contract cancellations, and hence are contingent in both timing and amount. As a result, the amount of the liability properly allocable to any of the years under the contract cannot be accurately determined until the contract expires. Neither the statute nor the regulations provide specific guidance for handling these uncertainties.

The responsibility for developing fair and administrable standards for implementing statutory requirements lies with the Commissioner. Respondent acknowledges on brief the practical difficulty of applying the economic performance requirement under the circumstances of these cases. It appears to be respondent's position, at least for purposes of these cases, that where the timing and amount of services to be provided to the taxpayer cannot be determined before expiration of the service contract, but the taxpayer can demonstrate "a reasonable manner in which to estimate the amount and timing of the services that will be required", respondent will permit the taxpayer to accrue its liability over the term of the contract in accordance with the taxpayer's estimates. Respondent determined that the Dealerships

failed to make the requisite showing, and accordingly may not deduct the Fees until expiration of the VSC's to which they relate.

We accept respondent's interpretation of the economic performance rule and adopt it as the evidentiary standard for these cases. However, we do not agree with respondent's application of this standard.

One index for measuring the Administrator's performance may be found in the provisions of the operative agreements that govern how the Fees are earned for refund purposes. Under the refund formula, the Fees attributable to a contract are earned in proportion to the greater of time elapsed or mileage driven under the contract. This formula reflects two important aspects of the Administrator's performance. First, the Administrator was obligated to incur substantial costs simply in making certain resources available at all times for processing claims and cancellations, whether or not a claim or cancellation notice was actually filed. Second, the Administrator provided recordkeeping and reporting services regularly throughout the term of the VSC.

We think that the refund formula represents "a reasonable manner in which to estimate the amount and timing of the [Administrator's] services" for purposes of section 461(h), and neither party has established the validity of any other estimation approach. The formula implies that, for any taxable

year while a VSC is in effect, the cumulative amount of Fees
incurred up to and including that year must bear the same
relation to the total Fees attributable to the contract as the
greater of time elapsed or mileage driven bears to the applicable
limit specified in the contract.  In general, while a contract
remained in effect the issuing Dealership would have known only
the amount of time elapsed; it would have had no means of
ascertaining the amount of mileage driven, unless the contract
holder brought the covered vehicle in for repairs.  In the
absence of mileage information, the Fees would have been
incurred, and may be recognized, in equal annual increments over
the maximum time period provided for in the contract to which
they relate.[11]  If for any taxable year the Dealership had
mileage information establishing a higher cumulative amount of
Fees incurred than the amount implied by time elapsed, then a
compensating adjustment would be made for that year.[12]

   b.  Timing of Income

   Petitioners argue that "proper matching of income and
expense under the accrual method requires deferred recognition of
the portion of the purchase price allocable to Administrator Fees

---

[11] Cf. Hinshaw's, Inc. v. Commissioner, T.C. Memo. 1994-327
(reaching a consistent result on similar facts).

[12] We leave to the parties the task of applying this formula
to each of the VSC's in the random sample that respondent used to
compute the revised adjustments and that the parties have agreed
to use as the basis for Rule 155 computations.

and Premiums until the corresponding deductions are allowed."
The authority on which they rely is Artnell Co. v. Commissioner,
400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411
(1967).

Inasmuch as the use of the accrual method serves different
purposes under the Federal income tax laws and under financial
accounting, the matching of income with related expenses often
will not result in the clear reflection of income for Federal
income tax purposes. Thor Power Tool Co. v. Commissioner, 439
U.S. 522, 539-544 (1979); RCA Corp. v. United States, 664 F.2d
881, 885-886 (2d Cir. 1981). Section 446(b) provides that if the
method of accounting used by the taxpayer does not clearly
reflect income, the computation of taxable income shall be made
under such method as, in the Commissioner's opinion, does clearly
reflect income. The courts generally have upheld the
Commissioner's discretion under section 446(b) to deny taxpayers
the right to defer prepaid service income until the periods when
related costs will be incurred and taken into account. Schlude
v. Commissioner, 372 U.S. 128 (1963); American Auto. Association
v. United States, 367 U.S. 687 (1961); Automobile Club of
Michigan v. Commissioner, 353 U.S. 180 (1957); RCA Corp. v.
United States, supra at 885-888.

In Artnell Co. v. Commissioner, supra, the Court of Appeals
for the Seventh Circuit held that a baseball team owner's

deferral of income from advance sales of season tickets and broadcasting rights until the taxable year in which the games to which the income was allocable would be played could clearly reflect income.  In so holding, the court distinguished the three Supreme Court cases cited above, "where the time and extent of performance of future services were uncertain."  "The uncertainty stressed in those decisions is not present here.  The deferred income was allocable to games which were to be played on a fixed schedule.  Except for rain dates there was certainty."  Artnell Co. v. Commissioner, 400 F.2d at 983-984.

This Court generally has limited Artnell Co. to its facts. Chesapeake Fin. Corp. v. Commissioner, 78 T.C. 869, 880-881 (1982); T.F.H. Publications, Inc. v. Commissioner, 72 T.C. 623, 644-645 (1979), affd. without published opinion 622 F.2d 579 (3d Cir. 1980); Standard Television Tube Corp. v. Commissioner, 64 T.C. 238, 242 (1975); Continental Ill. Corp. v. Commissioner, T.C. Memo. 1989-636, affd. 998 F.2d 513 (7th Cir. 1993); cf. Collegiate Cap & Gown Co. v. Commissioner, T.C. Memo. 1978-226 (following Artnell Co. in a case appealable to the Seventh Circuit, under the rule of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  As we stated in T.F.H. Publications, Inc. v. Commissioner, supra at 644:  "Since Artnell Co. this Court has indicated that it will not follow the

rationale of that case unless the facts present a certainty, of performance or fixed dates, such as was presented in Artnell Co."

The cases at hand are distinguishable from Artnell Co. on their facts. First, the evidence does not establish that the Dealerships incurred costs for administration of the PLRF arrangement according to a fixed schedule. We concluded above that, in the absence of mileage information, the Dealerships could reasonably estimate their administrative costs in accordance with the passage of time. But the amount of mileage driven under a contract would be ascertainable for any year in which a mechanical breakdown or cancellation occurred, and might control the determination of costs incurred for that year. Thus, the proper schedule for accrual of these costs remained at all times contingent upon wholly unpredictable variables. Cf. T.F.H. Publications, Inc. v. Commissioner, supra; Standard Television Tube Co. v. Commissioner, supra. Second, as petitioners themselves argued with respect to the reserve deposits issue, the Dealerships' performance is not certain, because the purchaser retains the right to cancel. If the Dealerships were permitted to defer income until the period when they are allowed offsetting deductions for Fees and Premiums, they might never report the income. Cf. Continental Ill. Corp. v. Commissioner, supra. It was not an abuse of discretion for respondent to refuse to permit the Dealerships to match their income with their expenses.

4.  Section 481 Adjustment

Respondent made an additional adjustment to the income of petitioner DFM Investment Co. for its taxable year ended March 31, 1990, pursuant to section 481.  The adjustment purports to reflect the aggregate of the unreported income realized from the sale of VSC's in prior taxable years plus accumulated investment income, reduced by allowable deductions for refunds, payments to other repair facilities, Commissions, and an amortization allowance for Premiums.  The controversy concerns whether section 481 authorizes an adjustment under the circumstances of this case.

Section 481(a) provides that where taxable income for any year is computed under a method of accounting that is different from the method used for the preceding year, then the computation of taxable income for the year of the change shall take into account those adjustments that are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted.  A change in method of accounting to which section 481 applies includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in the overall plan.  Secs. 1.481-1(a)(1), 1.446-1(e)(2)(ii)(a), Income Tax Regs.  A material item is "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction."

Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  In determining whether a change in a reporting practice involves the proper time for the inclusion or deduction of an item, the relevant question generally is whether the change affects the aggregate amount of taxable income over the taxpayer's lifetime.  If the change affects the amount of taxable income for 2 or more taxable years without altering the taxpayer's lifetime taxable income, then it is strictly a matter of timing and constitutes a change in method of accounting.  Copy Data, Inc. v. Commissioner, 91 T.C. 26, 30- 31 (1988); Schuster's Express, Inc. v. Commissioner, 66 T.C. 588, 597 (1976), affd. without published opinion 562 F.2d 39 (2d Cir. 1977).

Petitioners argue that respondent's adjustments to the method used by the Dealerships to report income and expense under the VSC program do not trigger application of section 481.  They correctly point out that to the extent unreported amounts were ultimately refunded to the purchaser or paid to Travelers, the Administrator, the Administrator's sales agent, BPI, or other authorized repair facilities, the Dealerships' reporting practice resulted not in deferral of income but rather in permanent exclusion.  "Here * * * the issue is whether income should be reported by the Dealerships, not when it should be reported. The amounts which Respondent proposes to include in a Code sec. 481 adjustment were not reported at all."  Consequently,

"Respondent's proposed adjustments do not represent a change in the Dealerships' method of accounting".[13]  We disagree.

Respondent corrected the Dealerships' use of the accrual method to report income and expense under the VSC program.  If the proper application of the accrual method to the collection and ultimate disposition of the unreported portion of the contract price and investment income would not change a Dealership's lifetime taxable income, then correction of the Dealership's erroneous practice constitutes a change in method of accounting for purposes of section 481.  The unreported amounts were either applied to payment of expenses immediately following

---

[13] In addition, petitioners contend that even if respondent's adjustments do constitute a change in method of accounting, a further adjustment will not be required in order to prevent duplication or omission of income or expense.  They arrive at this conclusion by at least two lines of reasoning. First, they point out that "there would not be any duplication or omission due to the 'change' if the Dealerships are simply permitted to continue their current practice for VSC's sold in prior periods".  This observation appears to be correct, but it has no relevance whatever to the applicability of sec. 481. Second, they observe that respondent computed the sec. 481 adjustment by initially increasing DFM Investment Co.'s gross income by unreported receipts from the sale of VSC's and then making "a second set of Code §481 adjustments to eliminate its initial Code §481 adjustment over time.  If, as Respondent contends, these adjustments merely affect timing, then no duplication or omissions will occur, and neither of these proposed adjustments are required."  This argument is difficult to follow, but it appears either:  (1) To confuse the sec. 481 adjustment with the adjustments to the Dealership's method of accounting that necessitate the sec. 481 adjustment; or (2) to deny the applicability of sec. 481 for the very reason that it applies; or both.  At any rate, the argument is plainly without merit.

collection from the purchaser or deposited in the PLRF pending ultimate disposition. They could be released from the PLRF as a cancellation refund, payment for covered repairs, or a distribution of unconsumed reserves. Thus, the following six cases cover all possibilities for the ultimate disposition of the unreported amounts:

(1) Payment for Premium, Commissions, or Fees;

(2) refund upon cancellation of the contract;

(3) release to another repair facility to pay for covered repairs;

(4) release to the Administrator upon expiration of the contract or termination of the Dealership's participation in the program;

(5) release to the Dealership to pay for covered repairs; or

(6) release to the Dealership upon expiration of the contract or termination of the Dealership's participation in the program.

The Dealership's practice was to report income only when and to the extent that reserves were released to the Dealership under cases (5) and (6). Amounts disposed of under each of the other cases were never recovered by the Dealership and hence would never have been reported as income. The proper application of the accrual method is to include the full contract price in income for the year the VSC was sold and, to the extent that the

Dealership is treated as owner of the PLRF, to include investment income as it accrues. For cases (1) through (4), a deduction is allowable for the year in which the expense is incurred or, if capitalized, the year in which it is taken into account through amortization.

Thus, the Dealership's practice resulted in permanent exclusion only where a deduction would have been allowable for a later period. Compared with the proper application of the accrual method, the Dealership's practice had the effect of either deferring income (cases (5) and (6)) or accelerating a deduction (cases (1) through (4)). Correction of this practice cannot affect the Dealership's lifetime taxable income under any circumstances: it can only affect the time when an increase or offsetting reduction to lifetime income is taken into account. Cf. Knight-Ridder Newspapers v. United States, 743 F.2d 781, 798-799 (10th Cir. 1984). Accordingly, the correction represents a change in method of accounting for purpose of section 481.

The second requirement for application of section 481 is that, in the absence of an adjustment for prior years, amounts would be duplicated or omitted in the computation of taxable income solely by reason of the change in method of accounting. This requirement is also satisfied. Income attributable to contracts in prior years which the Dealership would have reported in some later years in cases (5) and (6) would be omitted as a

result of the change, because the proper time for reporting this income under the accrual method would have passed.  In cases (1) through (4) the accrual method would allow the Dealership to claim a deduction for expenses corresponding to amounts previously excluded from gross income.  Since excluding an amount from income is essentially equivalent to recognizing income and offsetting it by a current deduction, the change in method of accounting would effectively result in the duplication of deductions.  Cf. Western Cas. & Sur. Co. v. Commissioner, 571 F.2d 514, 519 (10th Cir. 1978), affg. 65 T.C. 897 (1976).

The courts have repeatedly held that a change in method of accounting subject to section 481 results where a taxpayer is required to cease a practice of improperly reducing gross receipts by amounts allocable to a reserve for estimated losses or contingent liabilities.  Knight-Ridder Newspapers, Inc. v. United States, supra; North Cent. Life Ins. Co. v. Commissioner, 92 T.C. 254 (1989); Copy Data, Inc. v. Commissioner, 91 T.C. 26 (1988); Klimate Master, Inc. v. Commissioner, T.C. Memo. 1981-292.  In substance, the cases at hand present the same issue and they require the same result.

Petitioners correctly cite a number of our decisions for the proposition that correction of practices under which a taxpayer improperly excluded items from gross income does not necessarily constitute a change in method of accounting or may not otherwise

warrant an adjustment under section 481.  But the cases petitioners cite are readily distinguishable on their facts.

In Saline Sewer Co. v. Commissioner, T.C. Memo. 1992-236, the taxpayer was a utility company that excluded customer connection fees from gross income on the theory that they were contributions to capital.  We found that the mischaracterization caused a permanent distortion of Saline Sewer's taxable income, and accordingly respondent's recharacterization of these receipts as taxable income did not give rise to a section 481 adjustment.

In Schuster's Express, Inc. v. Commissioner, 66 T.C. 588 (1976), the result turned in part on the unusual procedural posture of the case.  The Commissioner, who bore the burden of proof, failed to establish that under the taxpayer's method of reserve accounting for estimated insurance expenses "there was any procedure or intention to restore the excessive deductions to income in future years so as to properly reflect * * * [the taxpayer's] total lifetime income."  Id. at 596.  In the absence of proof by the Commissioner that the change was solely a matter of timing, we declined to sustain a section 481 adjustment.

In Security Associates Agency Ins. Corp. v. Commissioner, T.C. Memo. 1987-317, the taxpayer was required to include advance payments of insurance commissions for the year when received rather than for the following year when earned.  We held that although there had been a change in the taxpayer's method of

accounting, the Commissioner had improperly computed the section 481 adjustment by including certain items that did not constitute taxable income, items that may already have been included in the taxpayer's income, and items for which an offsetting deduction would have been allowable under the proper method for the year of the change.

None of the authorities on which petitioners rely conflicts with the section 481 analysis set forth above.  We conclude that an adjustment under section 481 is proper.[14]

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[14] The sec. 481 adjustment must be recomputed under Rule 155 in accordance with the treatment for Fees prescribed herein.